#28426-a-SLZ
**2018 S.D. 58**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JAMES BLUE,                                         Plaintiff and Appellee,

   v.

THOMAS E. BLUE,                                   Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CARMEN MEANS
Judge

\* \* \* \*

JOHN "JACK" S. THEELER
ZACHARY T. FLOOD
Morgan Theeler, LLP                               Attorneys for plaintiff and
Mitchell, South Dakota                            appellee.


DAVID J. LARSON
ALBERT STEVEN FOX
Larson Law, P.C.                                  Attorneys for defendant and
Chamberlain, South Dakota                         appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
MAY 21, 2018
OPINION FILED **07/18/18**

#28426

ZINTER, Justice

[¶1.]        Tom and Jim Blue inherited two parcels of land as tenants in common. Approximately ten years later, Jim commenced this action to partition one of the parcels. Tom counterclaimed for partition and for the value of purported improvements. He also counterclaimed for restitution for the time he spent caring for both properties. The circuit court partitioned the land equally, awarded Tom owelty, and denied Tom's claims for improvements and restitution. Tom appeals. We affirm.

## Facts and Procedural History

[¶2.]        In 2004, upon the death of their father George Blue, Tom and Jim Blue inherited two interests in real estate as tenants in common. They each received an undivided 50% interest in a half section of land in Beadle County. They also each received an undivided 25% interest in a quarter section of land in Hughes County. The remaining 50% interest in the Hughes County parcel was owned by another cotenant who is not part of this case.

[¶3.]        After George's death, Tom undertook the responsibility to continue caring for the properties. All of the Hughes County land and portions of the Beadle County land continued to be rented to others for farming. Much of the unrented portions of the Beadle County land continued to be put into the Conservation Reserve Program (CRP). Tom renewed several CRP contracts in 2007 and 2009, and he performed the work necessary for CRP qualification and compliance. The remaining Beadle County land included two tree belts, unproductive grassland used

for hunting, and several depleted gravel pits. There was also a small manmade lake in the middle of the property.

[¶4.]     Tom and Jim had weekly conversations regarding the management and care of the properties. However, Jim was not interested in working on or maintaining the land, and he did not provide any of the physical or business-related work. The record reflects that Tom had a significant attachment to the Beadle County land based on the time he spent with George working and recreating on the land before George's death. Most of Tom's time spent on the Beadle County land involved the southwest quarter, which had poor soil quality and was less productive than the southeast quarter. The southwest quarter was also where Tom and George spent time hunting, developing wildlife habitat, building most of the lake, and generally maintaining the property. Shortly before George's death, Tom placed a monument to George to the east of the lake, which is on the southeast quarter.

[¶5.]     The income and expenses relating to both properties were divided equally between the brothers. Until this dispute developed, Tom never asked Jim for any compensation. In 2013, when Jim pushed to sell the Beadle County land, Tom refused, and the brothers had a falling out. Thereafter, Jim commenced this action to partition the Beadle County land. Tom counterclaimed for partition and a credit for claimed improvements to the property. He also sought restitution for his time and labor in caring for both properties. His claims for restitution were based on theories of unjust enrichment and quantum meruit.

[¶6.]     The brothers stipulated that the Beadle County land could be partitioned in kind and that no sale was required. They also waived appointed

referees, *see* SDCL 21-45-15, and agreed to hire separate appraisers to value the property and assist the circuit court in dividing the land. Jim retained certified appraiser Bryan Maas, and Tom retained certified appraiser Tom Meekins. Both appraisers focused on partitioning the half section into the southwest and southeast quarters subject to certain adjustments and the payment of owelty.

[¶7.] Maas valued the southeast quarter at $555,700 and the southwest quarter at $473,700, for a total value of $1,029,000. He opined that it would be necessary to add twelve acres to the southwest quarter to equalize the value of the partitioned land. However, he also opined that it would be more practical to divide the property equally at the quarter-section line and require that whoever received the southeast quarter pay $41,200 owelty to whomever received the less valuable southwest quarter.

[¶8.] Meekins valued the southeast quarter at $470,800 and the southwest quarter at $369,200, for a total value of $840,000. He opined that the party who received the southwest quarter should receive an additional twenty-four acres from the southeast quarter to equalize value. He also opined that if the land were divided equally, the owelty should be $51,190. Meekins agreed that dividing land at the quarter-section line was common practice, but he did not provide an opinion whether that would be reasonable in this case.

[¶9.] Tom provided a third opinion. Although he did not provide a valuation of the two parcels, he testified that the party who received the southwest quarter should receive an additional forty acres from the southeast quarter in order to provide each party with an equal amount of income-producing land. He also

testified that he preferred the less productive southwest quarter because that is where he did most of the work with George.

[¶10.]    At the conclusion of the trial, the court adopted Maas's view that it would be more practical to divide the property equally at the quarter-section line. In accordance with Tom's request, the court awarded the southwest quarter to Tom and the southeast quarter to Jim. The court also adopted Meekins's opinion on values and ordered Jim to pay Tom $51,190 in owelty. Finally, the court denied Tom's claims for improvements, unjust enrichment, and quantum meruit.

[¶11.]    Tom appeals, and we restate his issues as follows:

1. Whether the circuit court erred in denying Tom's claims for unjust enrichment and recovery in quantum meruit.

2. Whether the circuit court abused its discretion in limiting Tom's testimony.

3. Whether, in partitioning the Beadle County land, the circuit court erred in (a) failing to make a monetary adjustment for inferior soil types of some acres, (b) failing to give Tom a monetary credit for improvements he made to the land, and (c) dividing the land equally with owelty to Tom.

**Decision**

*Unjust Enrichment and Quantum Meruit*

[¶12.]    At trial, Tom claimed Jim owed him more than $300,000 in restitution for his time in caring for both properties between 2004 and 2014. Tom sought restitution for services at a rate of $20 per hour for thirty hours per week for ten and a half years. Tom argued he was entitled to recover from Jim in quantum meruit because he claimed his services were performed with the expectation that he would be paid. He also sought recovery on a theory of unjust enrichment. He

claimed his services conferred a benefit to Jim and that Jim would be unjustly enriched if Jim were not required to reimburse Tom. Jim resisted these claims. He contended that a cotenant could not be compensated for services absent an agreement. He also emphasized that Tom's claim regarding the amount of time worked was inconsistent with Tom's testimony that he only went to the land three to nine times a year.

[¶13.] On appeal, Tom contends the circuit court erred to the extent that it ruled a cotenant may not recover from another cotenant for services performed on the property absent an agreement for compensation. Tom correctly points out that the doctrines of unjust enrichment and quantum meruit contemplate that no express agreement for compensation exists. *See Johnson v. Larson*, 2010 S.D. 20, ¶¶ 8-11, 14, 779 N.W.2d 412, 416-17 (noting that claims of unjust enrichment and recovery in quantum meruit are available absent an express agreement for compensation). However, the lack of an express agreement was not the only reason the court rejected Tom's claims. Other elements of quantum meruit and unjust enrichment were not proven here. We address each claim separately.

[¶14.] "Quantum meruit implies a contract where none exists and awards restitution for the value of the services provided under that implied contract." *Id.* ¶ 14, 779 N.W.2d at 417; *accord Van De Walle & Assocs., L.L.C. v. Buseman*, 2003 S.D. 70, ¶ 9, 665 N.W.2d 84, 87 ("Typically, when a person provides services or materials to another and those services or materials are voluntarily accepted, it is inferred that the services or materials 'were given and received in the expectation of being paid for, and a promise to pay their reasonable worth implied.'" (quoting

*Randall Stanley Architects, Inc. v. All Saints Cmty. Corp.*, 1996 S.D. 138, ¶ 21, 555 N.W.2d 802, 805)). For Tom to recover in quantum meruit, he must have proven, among other things, that Jim "requested [Tom's] services and [Tom] reasonably expected to be paid." *Johnson*, 2010 S.D. 20, ¶ 14, 779 N.W.2d at 417.

[¶15.]     Here, the circuit court denied recovery in quantum meruit because it found not only that no express agreement existed but also that "[n]o evidence establishes any sort of implied contract existed between the parties for payment of services." The court first noted that Jim did not request Tom's services. The court found that although Jim consented to the services, Jim did not "care[] one way or the other," and the "services happened because [Tom] wanted them to happen." The court also noted that Tom did not expect compensation. The court specifically found that Tom's services "were provided because of his own passion for this land as opposed to any agreement or because [he] expected compensation for his services." Consequently, the court found that there was insufficient evidence to imply a contract that would provide for recovery in quantum meruit.

[¶16.]     The evidence supports these findings. Jim testified that he did not care to work on the land and that Tom never requested compensation until their falling out ten years after they inherited the property. Tom confirmed that he never demanded payment. He testified he would never ask for payment unless Jim wanted to sell the land, but he could not recall whether he ever told Jim he expected payment. These facts do not suggest the existence of an implied contract for payment of services to Tom. The circuit court did not err in rejecting Tom's claim for recovery in quantum meruit.

[¶17.]     "Unjust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.'" *Hofeldt v. Mehling*, 2003 S.D. 25, ¶ 15, 658 N.W.2d 783, 788 (quoting *Parker v. W. Dakota Insurors, Inc.*, 2000 S.D. 14, ¶ 17, 605 N.W.2d 181, 187). In order to obtain restitution, it is not enough that the person retains the benefit—retention of the benefit must be *unjust*. *Id.*

[¶18.]     Jim does not dispute that he knew of and consented to Tom's services, that he received an equal share of profits from the land between 2004 and 2014, and that he did not physically contribute to the management or care of the property. However, Jim contends that retention of any benefits Tom may have provided would not be unjust under the facts of this case because Tom's services were provided in Tom's own self-interest. Jim points out that the brothers became cotenants by inheritance from their father, that they communicated weekly regarding what needed to be done, and that there was never any conversation or understanding that Tom would be paid for his time. Jim also highlights Tom's emotional connection to and long history caring for the Beadle County land.

[¶19.]     The record supports Jim's contention. Tom testified below and continues to emphasize his deep emotional attachment to the Beadle County land. The record also reflects that the property was his "spiritual connection" to his father. Jim confirmed this connection. He testified that before George died, George asked Jim to "hang on to the land for a few years for Tom to have an opportunity to get over his attachment to it." Jim also testified: "Tom told me he'd take care of everything, don't worry about anything, no charges, don't worry . . . ." Thus, Jim

indicated that although he could have sold the land at any time, he held on to it for Tom's benefit. He also indicated that he never knew Tom expected to be compensated for his services. As previously noted, Tom conceded that he never requested compensation from Jim until the brothers had a falling out in 2013. And although Tom testified he would never demand compensation unless Jim wanted to sell the land, Tom could not confirm whether he ever conveyed that information to Jim.

[¶20.]     Under these facts, the circuit court did not clearly err in finding that Tom's services were largely provided in his own self-interest—they "were provided because of [Tom's] own passion for" the land and "happened because [Tom] wanted them to happen." "[A] person who without mistake, coercion, or request has unconditionally conferred a benefit upon another is not entitled to restitution." *Dowling Family P'ship v. Midland Farms*, 2015 S.D. 50, ¶ 24, 865 N.W.2d 854, 864; *accord Johnson*, 2010 S.D. 20, ¶ 8, 779 N.W.2d at 416 ("Unjust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party."). Accordingly, the circuit court did not err in denying Tom's claim for unjust enrichment.

*Limiting Tom's Testimony*

[¶21.]     Tom claims the circuit court abused its discretion in purportedly limiting his testimony relating to specific details concerning the land. Tom provides one example. He claims the circuit court "cut Tom's testimony short by telling him that he had only 1.5 minutes to testify concerning the various CRP programs and contracts affecting numerous issues in the case."

[¶22.] The record does not support Tom's claim that the circuit court prevented him from introducing detailed testimony. Instead, the record quite clearly shows that the court was properly attempting to limit Tom's long narrative answers in direct examination. The court simply requested Tom's attorney to ask direct questions for Tom to answer, "as opposed to Mr. Blue just telling [the court] everything." Moreover, the court overruled several of opposing counsel's objections to Tom's subsequent nonresponsive answers. SDCL 19-19-611 grants the court "reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) [m]ake those procedures effective for determining the truth; [and] (2) [a]void wasting time." The court's restriction in limiting narrative answers was a perfectly reasonable control over the method of examining witnesses and presenting evidence.

*Partition*

[¶23.] "Partition is a proceeding in equity and the court has the inherent jurisdiction to adjust all the equities in respect to the property." *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850. Tom takes issue with three of the circuit court's decisions regarding the partition of the Beadle County land. We review the circuit court's equitable decisions for an abuse of discretion. *Id.* An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* We review the circuit court's findings on value for clear error. *See Engelhart v. Larson*, 1997 S.D. 84, ¶ 19, 566 N.W.2d 152, 156.

[¶24.] Tom first argues the court erred in declining to make adjustments for alleged overvaluation of some parts of the quarter section he received. He points out that Meekins, his appraiser who personally observed the land with Tom, relied on outdated soil maps. Meekins acknowledged that the soil maps did not correlate with some of the soils he actually observed. For example, the maps did not show that the manmade lake existed. He also noted that there were depleted gravel pits that could not be used for anything productive and that there were about eleven acres he had to designate as grassland even though those acres clearly were not grassland.[1] However, Meekins explained that due to the unique nature of the property—primarily the southwest quarter—he could not find comparable sales to more accurately assign a value; and therefore, he was required to rely on the outdated soil maps in valuing the land. Ultimately, he acknowledged that although the southwest quarter's actual value *could* be lower, he declined to change his appraised value.

[¶25.] This record does not reflect that the circuit court clearly erred in declining to make additional downward adjustments in value in the southwest quarter. Valuation here was relevant to the question of owelty; the acres in dispute were a relatively small portion of the southwest quarter; the two appraisers'

---

1. Meekins testified that he had some disagreements with Tom regarding the appraisal. According to Meekins, Tom did not want certain acres of CRP with low-quality soil listed as income producing. Meekins nevertheless valued those areas as CRP because they were currently in CRP, he did not know whether the acres would continue to be in CRP, and he had no comparable sales from which he could derive a discount. There were also eleven acres that Tom wanted considered "roads and waste." Meekins told Tom he "was not going to change [his] value for those 11 acres [and] that it was contingent upon [Tom] to persuade the [c]ourt in that regard."

opinions on owelty differed by only $10,000 for the entire property; and the court awarded Tom Meekins's higher recommendation on owelty. Further, we cannot assume that Meekins actually overvalued the southwest quarter. Meekins acknowledged that the soil maps were outdated, but he adhered to his opinion of value. Moreover, Maas valued the same quarter substantially higher than Meekins.

[¶26.] Tom, however, insists that "the best evidence of the current condition of the property" was his testimony suggesting a lesser value; and therefore, the amount of owelty ordered by the circuit court "fell far short of reflecting actual values." But Tom only makes general assertions of error based on broad soil categories and how much income-producing land each party would possess after partition. Tom does not identify any specific dollar adjustment that he claims the evidence requires. Ultimately, the circuit court chose to adopt Meekins's testimony as to value, and Tom has not quantified an adjustment to owelty that is required by the evidence. Tom has not established clear error in the court's determination of owelty.

[¶27.] Tom next argues the circuit court abused its discretion in failing to give him credit for improvements he made to some of the property. Tom contends he obtained CRP contracts that increased the value of 33.6 acres from $100 an acre to $2,500 an acre. The circuit court declined to give Tom credit because "[n]either appraiser testified to any permanent improvements or enhancements to the value of the land" and because "[n]o one testified as to any permanent improvements."

[¶28.] Generally, courts may "make suitable allowance, on partition, for improvements made in good faith by a cotenant in possession, to the extent that the

value of the property has been enhanced thereby." *Johnson v. Hendrickson*, 71 S.D. 392, 398-99, 24 N.W.2d 914, 917 (1946). However, the court has the "discretion to deny entirely any award for the value of improvements in a partition action." *Kaberna v. Brown*, 2015 S.D. 34, ¶ 17, 864 N.W.2d 497, 502. Tom contends the circuit court here erred as a matter of law in reasoning that such allowances are not permitted unless the improvement is "permanent."

[¶29.]     "The term 'improvement' is generally defined to include everything, such as buildings and fixtures, that permanently enhances the value of premises for general uses." *In re Tax Appeal of Logan & Assocs.*, 331 N.W.2d 281, 283 (S.D. 1983). Tom contends that in a partition action, an improvement need not be permanent so long as it substantially enhances the value of the property. *See, e.g.*, *Leinweber v. Leinweber*, 385 P.2d 556, 558 (Wash. 1963) (holding that summer fallowing was an improvement for purposes of a partition action because summer fallowing "was not only necessary, but also substantially enhanced the valuation of the property").

[¶30.]     We need not address the legal question concerning permanency because there is an insufficient factual basis for Tom's argument. Tom suggests that 33.6 acres of CRP land worth $2,500 per acre south of the lake would be valued as $100-per-acre "wasteland" but for his efforts.[2] Tom appears to have selectively obtained these values from separate portions of Maas's and Meekins's appraisals.

---

2.     Tom makes inconsistent claims in his valuation arguments. It appears that the acres for which Tom wants credit for improvements in this argument include the acres that Tom claims were overvalued by his appraiser in an earlier argument. *See supra* n.1.

Maas valued CRP land at $2,500 an acre, and Meekins valued wasteland at $100 an acre.[3] However, neither appraiser testified that they would value those 33.6 acres as wasteland if the acres were not in CRP, and Meekins expressly declined to do so.

[¶31.] Moreover, the record reflects that CRP contracts have various effects on value. CRP contracts provide government subsidies that are only ten to fifteen years in duration, and the contracts for this property were set to expire between 2017 and 2019. There was also no evidence they would or could be renewed. Additionally, not all CRP contracts increase value. Maas testified that when farming practices change, CRP can actually decrease the value of land. Finally, most of the CRP work Tom did was in the southwest quarter, which was awarded to him, and the appraisers indicated the value of the CRP contracts was factored into their appraisals. The circuit court has discretion to deny an allowance for improvements, *Kaberna*, 2015 S.D. 34, ¶ 17, 864 N.W.2d at 502, and even when allowable, the court is only obligated to make a "suitable allowance," *Hendrickson*, 71 S.D. at 398-99, 24 N.W.2d at 917. Although the CRP contracts affected the appraised value, Tom has not demonstrated that the circuit court abused its discretion in declining to give him an additional credit for them. *See Gartner*, 2014 S.D. 74, ¶ 23, 855 N.W.2d at 854.

[¶32.] Tom next argues the circuit court abused its discretion in dividing the Beadle County land equally along the quarter-section line with owelty to be paid to

---

3. Tom appears to have selected these values in order to maximize his claim for a credit. He chose Meekins's value for wasteland, which was less than Maas's $200 per acre; and he chose Maas's fixed value for CRP, which was more than Meekins's valuation method that based the price on the soil quality and income.

Tom, instead of allocating acreages of equal pecuniary value. Tom first contends that in making the division, the court should have utilized a factors analysis like that in *Engelhart*, 1997 S.D. 84, ¶ 6, 566 N.W.2d at 153-54, and *Gartner*, 2014 S.D. 74, ¶ 14, 855 N.W.2d at 852. However, the factors outlined in *Engelhart* were instructions the circuit court provided to the appointed referees to assist them in determining fair market value. *Englehart*, 1997 S.D. 84, ¶ 6, 566 N.W.2d at 153. Here, the parties waived the referee requirement, and it is apparent that the expert appraisers followed very similar factors in rendering their opinions of value. Further, the *Gartner* factors referenced by Tom are only used to determine whether prejudice to the owners should preclude a partition in kind, a question not at issue here. *See Gartner*, 2014 S.D. 74, ¶ 14, 855 N.W.2d at 852 ("We examine the totality of the circumstances to determine whether a partition in kind would cause great prejudice to the owners."). The circuit court did not err in declining to utilize either factors analysis here.

[¶33.] Tom finally contends that dividing the land along the quarter-section line ignores the disparity between the amount of income-producing land in the southwest and southeast quarters, cuts through a tree belt, separates his father's monument from the southwest quarter, and fails to minimize owelty. However, the circuit court had substantial discretion in dividing the property. Further, a cotenant in a partition action is not entitled to the most economically valuable or most functional parcel. *See id.* ¶ 12, 855 N.W.2d at 851. And in exercising its broad discretion, the court was not absolutely required to partition the land with minimal owelty. *Id.* ¶ 23, 855 N.W.2d at 854.

[¶34.] Here, both Jim and Maas testified that dividing the land at the quarter-section line would be more practical, and Meekins admitted that equal divisions were common practice. The court adopted this view, concluding that dividing this land into two unequal quarters would be less practical and would diminish the value of the resulting parcels. Considering Tom's preference for the southwest quarter, the court then stated that "it would seem appropriate . . . to grant the southwest quarter to Tom Blue and the southeast quarter to Jim Blue." The Court finally ordered Jim to pay Tom owelty in the amount suggested by Tom's expert appraiser. Tom has not shown that division at the quarter-section line with $51,190 in owelty was an abuse of discretion.

## Conclusion

[¶35.] The circuit court did not err in denying Tom's claims for unjust enrichment and quantum meruit. The court did not abuse its discretion in controlling the presentation of evidence. Finally, the court did not clearly err or abuse its discretion in dividing the Beadle County land into equal quarter sections and ordering that Jim pay Tom $51,190 in owelty.

[¶36.] Affirmed.

[¶37.] GILBERTSON, Chief Justice, KERN and JENSEN, Justices, and SEVERSON, Retired Justice, concur.

[¶38.] SALTER, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.