#28279-a-MES
**2019 S.D. 8**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

WAYLON NATHAN UHRE,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE MICHAEL W. DAY
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                        appellee.

ELLERY GREY of
Grey & Eisenbraun Law Prof. LLC
Rapid City, South Dakota                    Attorneys for defendant and
                                        appellant.

\* \* \* \*

ARGUED OCTOBER 3, 2018
OPINION FILED **01/23/19**

#28279

SALTER, Justice

[¶1.]     Waylon Uhre was convicted following a jury trial of first-degree rape, multiple counts of sexual contact with a child, and possessing, manufacturing, or distributing child pornography. He appeals, claiming the circuit court violated his right to a public trial when it ordered the partial closure of the courtroom during the minor victim's testimony. Uhre also argues the court erred when it denied his motion to suppress his non-custodial statement to a law enforcement officer. We affirm.

## Background

[¶2.]     On June 30, 2015, E.B.'s parents left E.B., then four years old, and her older brother with their grandparents in Black Hawk while they took an overnight trip. Waylon Uhre, E.B.'s adopted uncle, lived with E.B.'s grandparents. That evening, E.B. told her grandmother that Uhre made her perform a sexual act on him earlier that day. E.B.'s grandparents removed Uhre from the home, and E.B.'s father contacted law enforcement the next day.

[¶3.]     Hollie Strand, a forensic interviewer with the Child's Advocacy Center, interviewed E.B. on July 2, 2015. E.B. told Strand she licked Uhre. Strand noted that E.B. was anxious, "incredibly guarded," and "avoidant" during the interview. Strand provided the family with options, including counseling, to help E.B. and suggested giving her more time before considering a second interview.

[¶4.]     On July 7, 2015, Deputy Dustin Bostrom with the Meade County Sheriff's Office called Uhre and requested a meeting to discuss E.B.'s allegations. Uhre told Bostrom that he had spoken with an attorney and wanted to speak with

-1-

the attorney again before any meeting, adding his attorney would contact Bostrom. Attorney Robbie Rohl called Bostrom six days later, inquiring if Bostrom intended to indict Uhre. Bostrom told Rohl he was still investigating the matter. Bostrum testified that Rohl called him two days later and advised that he would not be representing Uhre in the criminal investigation.

[¶5.] After E.B. told her mother more details about the incident with Uhre, Strand interviewed E.B. a second time on July 14, 2015. During this interview, E.B. gave Strand more information, including where she was in her grandparents' home when Uhre made her "suck his wee-wee," what Uhre was wearing, and where her grandmother and brother were in the home when the abuse occurred.

[¶6.] Tye Parsons was also living with E.B.'s grandparents but was not home on the afternoon and evening of the incident. When Parsons returned, he was told to move out. While packing, he found a secure digital (SD) card on the floor in the doorway of Uhre's bedroom. Parsons believed the SD card was his and packed it with his belongings. He later viewed the contents of the SD card and found pornographic images of children, including E.B., along with pictures of Uhre. He gave the SD card to E.B.'s grandparents, who turned it over to law enforcement.

[¶7.] On February 22, 2016—over seven months later—Special Agent Brett Garland with the South Dakota Division of Criminal Investigation interviewed Uhre at a friend's home where Uhre was staying. While the two were inside of the home, Garland told Uhre that he did not want to bother Uhre and that he was free to get up and leave. Uhre, nevertheless, agreed to speak with Garland, but wanted to continue the conversation outside of the home. The two went to Garland's car,

where Garland again advised Uhre at least two times that he did not have to speak with him and could discontinue the interview at any time. During their conversation, Uhre admitted to several of E.B.'s allegations. Two days later, Uhre was charged by indictment with one count of first-degree rape, nine counts of sexual contact with a child, and twenty counts of possessing, manufacturing, or distributing child pornography.

[¶8.]     Prior to trial, the State filed a motion to close the courtroom to "all but the necessary persons" listed in SDCL 23A-24-6[1] during E.B.'s testimony, citing concerns about the victim's young age and the seriousness of the crimes. Uhre objected, asserting his Sixth Amendment right to a public trial and arguing there was insufficient justification to close the courtroom. Following oral arguments and post-hearing briefs, the circuit court issued a memorandum opinion granting the State's motion and ordering a partial closure of the courtroom during E.B.'s testimony. The court concluded a partial closure was necessary to protect E.B.'s interests based upon her age, psychological maturity, and the sensitive personal nature of her testimony.

---

1.     SDCL 23A-24-6 provides:

> Any portion of criminal proceedings, with the exception of grand jury proceedings, at which a minor is required to testify concerning rape of a child, sexual contact with a child, child abuse involving sexual abuse, or any other sexual offense involving a child may be closed to all persons except the parties' attorneys, the victim or witness assistant, the victim's parents or guardian, and officers of the court and authorized representatives of the news media, unless the court, after proper hearing, determines that the minor's testimony should be closed to the news media or the victim's parents or guardian in the best interest of the minor.

[¶9.]	Also prior to trial, Uhre moved to exclude his statement to Special Agent Garland, arguing it was obtained in violation of the holding in *Edwards v. Arizona,* which prohibits reinitiating police questioning after a suspect has asked for a lawyer in an earlier interview. 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Uhre contended he had requested an attorney during his initial telephone conversation with Deputy Bostrom over seven months earlier. The circuit court initially accepted Uhre's argument and granted his motion to suppress. However, the court later changed its ruling after granting the State's motion to reconsider, concluding, among other things, that the *Edwards* rule applies only in custodial situations.

[¶10.]	During the three-day trial, Uhre testified and denied the allegations, telling the jury he had been pressured into making a false confession. He also said he did not recognize the SD card, had never taken any sexually explicit photographs, and never possessed child pornography. The jury found Uhre guilty on all counts. The circuit court sentenced Uhre to 80 years in prison for first-degree rape, 15 years for each count of sexual contact with a child, and 10 years for each count of possessing, manufacturing, or distributing child pornography.

[¶11.]	Uhre appeals his conviction, raising the following issues:

1.	Whether the circuit court erred by ordering a partial closure of the courtroom during E.B.'s testimony in violation of Uhre's right to a public trial.

2.	Whether the circuit court erred when it denied Uhre's motion to suppress his statement to Special Agent Garland.

## Standard of Review

[¶12.] Uhre's claim that the circuit court's decision to partially close the courtroom violated his Sixth Amendment right to a public trial presents a legal question that we review de novo. *State v. Rolfe (Rolfe I)*, 2013 S.D. 2, ¶ 15, 825 N.W.2d 901, 905. A violation of the right to a public trial is among the narrow class of errors regarded as structural, and it is, therefore, not subject to further review for harmlessness. *See Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999) ("Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, 'only in a 'very limited class of cases.'" (quoting *Johnson v. United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997))).[2]

[¶13.] We review the circuit court's "ultimate decision to close a court proceeding for an abuse of discretion." *Rolfe I*, 2013 S.D. 2, ¶ 15, 825 N.W.2d at 905 (quoting *Rapid City Journal v. Delaney*, 2011 S.D. 55, ¶ 9, 904 N.W.2d 388, 392). An abuse of discretion is "a choice outside the range of permissible choices[.]" *State v. Stanley*, 2017 S.D. 32, ¶ 22, 896 N.W.2d 669, 678 (quoting *State v. Kvasnicka*, 2016 S.D. 2, ¶ 7, 873 N.W.2d 705, 708). We review the trial court's findings of fact justifying a courtroom closure for clear error. *State v. Rolfe* (*Rolfe II*), 2014 S.D. 47, ¶ 14, 851 N.W.2d 897, 902.

---

2. We recognize six types of structural error from *Neder*: "(1) a deprivation of the right to counsel; (2) a biased judge; (3) an unlawful exclusion of grand jurors of the defendant's race; (4) a deprivation of the right of self-representation at trial; (5) a deprivation of the right to a public trial; and (6) an erroneous reasonable doubt standard." *Miller v. Young*, 2018 S.D. 33, ¶ 14, 911 N.W.2d 644, 648 (quoting *State v. Arguello*, 2015 S.D. 103, ¶ 6, 873 N.W.2d 490, 493).

[¶14.]        "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Rademaker*, 2012 S.D. 28, ¶ 7, 813 N.W.2d 174, 176 (quoting *State v. Wright*, 2010 S.D. 91, ¶ 8, 791 N.W.2d 791, 794). We review the trial court's findings of fact "under the clearly erroneous standard. Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Id.*

## Analysis

### *Courtroom Closure*

[¶15.]        The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. The South Dakota Constitution similarly provides that "the accused shall have the right to . . . a speedy public trial . . . ." S.D. Const. art. VI, § 7. The right to a public trial serves to protect the accused and exists so "that the public may see [the defendant] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep [the defendant's] triers keenly alive to a sense of their responsibility and to the importance of their functions." *Rolfe I*, 2013 S.D. 2, ¶ 17, 825 N.W.2d at 906 (quoting *Waller v. Georgia*, 467 U.S. 39, 46, 104 S. Ct. 2210, 2215, 81 L. Ed. 2d 31 (1984)). In this regard, "[t]he public-trial right also protects some interests that do not belong to the defendant. After all, the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused." *Weaver v. Massachusetts*, ___ U.S. ___, 137 S. Ct. 1899, 1910, 198 L. Ed. 2d 420 (2017).

[¶16.] Notwithstanding constitutional protections, the right to a public trial is not absolute. *See Rolfe I*, 2013 S.D. 2, ¶ 18, 825 N.W.2d at 906. South Dakota statutory law authorizes a circuit court to exercise its discretion to partially or completely close the courtroom during criminal proceedings when minor victims are "required to testify concerning rape of a child, sexual contact with a child, child abuse involving sexual abuse, or any other sexual offense involving a child[.]" SDCL 23A-24-6. We have held that the application of this statute is guided by what have become known as the "*Waller* factors," which owe their moniker to the United States Supreme Court's decision in *Waller v. Georgia*. These factors include:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> [2] the closure must be no broader than necessary to protect that interest,
>
> [3] the trial court must consider reasonable alternatives to closing the proceeding, and
>
> [4] it must make findings adequate to support the closure.

467 U.S. at 48, 104 S. Ct. at 2216.

[¶17.] Courts across the country, including ours, have observed that the *Waller* decision contemplated a total courtroom closure—not a partial one. *See, e.g., United States v. Simmons*, 797 F.3d 409, 413 (6th Cir. 2015). "A total closure involves excluding all persons from the courtroom for some period while a partial closure involves excluding one or more, but not all, individuals for some period." *Id.*; *see also Rolfe III*, 2014 S.D. 7, ¶ 16, 851 N.W.2d at 902-03 ("Whether a closure is total or partial . . . depends not on how long a trial is closed, but rather who is excluded during the period of time in question.'" (quoting *United States v. Thompson*, 713 F.3d 388, 395 (8th Cir. 2013))).

[¶18.] Of course, "'both partial and total closures burden the defendant's constitutional rights, but 'the impact of [a partial] closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny.'" *Simmons*, 797 F.3d at 414 (*quoting Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001)); *see also Rolfe I*, 2013 S.D. 2, ¶ 22, 825 N.W.2d at 907 ("[A] partial closure does not 'implicate the same secrecy and fairness concerns that a total closure does.'") (quoting *United States v. Farmer*, 32 F.3d 369, 371 (8th Cir. 1994)). The justification for the partial closure should vary in proportion to the extent of the closure requested. Generally, "the more extensive the closure that is sought, the greater the burden on the party seeking closure." *United States v. Ledee*, 762 F.3d 224, 229 (2d Cir. 2014).

[¶19.] In this regard, we have modified the first *Waller* factor by allowing a partial closure to be supported by a "substantial reason" rather than the more stringent "overriding interest" described by *Waller* for complete courtroom closures. *Rolfe II*, 2014 S.D. 47, ¶ 17, 851 N.W.2d at 903. The remaining three *Waller* factors—testing the breadth of the closure against necessity, considering reasonable alternatives and making adequate findings—are more easily adapted to a partial courtroom closure and apply without modification. *See Rolfe I*, 2013 S.D. 2, ¶ 22, 825 N.W.2d at 907–08 ("[E]ven though a substantial reason, rather than an overriding interest, may justify the partial closure of the courtroom, the rest of *Waller*'s requirements must be addressed.").

[¶20.] We have also recognized the fact-bound nature of courtroom closures involving the testimony of child sex abuse victims and the need for case-by-case

determinations. *Id.* ¶ 19, 825 N.W.2d at 906; *State v. Slota*, 2015 S.D. 15, ¶ 21, 862 N.W.2d 113, 120. To assist in these determinations, courts consider the "victim's age, psychological maturity and understanding, the nature of the crime, the desires of the victim, and the interests of the parents and relatives." *Rolfe I,* 2013 S.D. 2, ¶ 19, 825 N.W.2d at 906; *Slota,* 2015 S.D. 15, ¶ 21, 862 N.W.2d at 120 (quoting *Globe Newspaper Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S 596, 608, 102 S. Ct. 2613, 2621, 73 L. Ed. 2d 248 (1982)).

[¶21.] Here, the circuit court ordered only a partial closure of the courtroom during E.B.'s testimony. The parties, attorneys, members of E.B.'s family, a victim assistant, and members of the media were not excluded from the courtroom. The courtroom was not closed, even partially, at any other time during the course of the three-day jury trial.

[¶22.] Further, the circuit court issued a pre-trial memorandum opinion in which it applied the *Waller* factors and assessed the applicable *Globe Newspaper* considerations before exercising its authority under SDCL 23A-24-6 to partially close the courtroom during E.B.'s testimony. The circuit court began its analysis by identifying the interest in protecting E.B.'s welfare. The court utilized the *Globe Newspaper* considerations and found that E.B. was four years old at the time of the incident and five at the time of the trial. The court also determined that "E.B. will not have the psychological maturity to testify in front of an audience, while not also incurring some form of psychological trauma from the experience." The court further noted the serious nature of the offenses alleged in the indictment would require "delving into sensitive and personal information." Under the circumstances,

the court found no reasonable alternative to protect E.B.'s interests other than partially closing the courtroom to the public during her testimony.

[¶23.] In our view, the circuit court correctly applied the governing legal principles, and its decision to partially close the courtroom during E.B.'s testimony did not violate Uhre's right to a public trial. The well-being of a child witness testifying as a victim in a rape trial is most certainly a substantial interest, if not an overriding interest. *See Globe Newspaper*, 457 U.S. at 607–08, 102 S. Ct. at 2620–21 (stating the interest in "the physical and psychological well-being of a minor" can justify a courtroom closure).

[¶24.] A partial closure can address the best interests of the child and assist in the orderly presentation of trial testimony. This is particularly true where, as here, the child victim is quite young. Even among child victims, E.B. was young—not much older than the minimum age for participation in forensic interviews, as explained by Hollie Strand.[3] The circuit court determined that the nature of the allegations meant the State would ask E.B. highly sensitive and personal questions. This determination is sound. The case involved allegations of first-degree rape of E.B. and her exploitation in the production of child pornography at the hands of Uhre, her adopted uncle. During her first forensic interview, E.B. was guarded. She was more open during her second interview, but still anxious.

[¶25.] While the court's determination that E.B. would not have the psychological maturity to be able to testify "in front of an audience" without

---

3. Strand provided this testimony and her description of E.B.'s anxiety during the forensic interviews at the pretrial hearing to consider the admissibility of E.B.'s hearsay statements pursuant to SDCL 19-19-806.1.

sustaining psychological trauma is not based on expert testimony, it is, nevertheless, a reasonable inference from the indisputable facts. Indeed, whether termed "psychological" trauma or not, the record provides adequate support for the sensible conclusion that a five-year-old girl would experience trauma by testifying in public about sexual abuse inflicted upon her by her uncle. *See A.B. v. Y.Z.*, 878 A.2d 807, 813 (N.J. 2005) (Rivera-Soto, J., concurring) ("Both our own limitations on expert testimony as well as plain common sense tell us that there is no need for expert proofs to reach the self-evident conclusion that requiring a child sexual abuse victim to confront [her] abuser in open court will be traumatic for the victim.").

[¶26.]        Further, the circuit court's determination of E.B.'s relative psychological maturity is adequately supported by the record. In this regard, we read the term "psychological maturity" used by the *Globe Newspaper* Court to mean developmental maturity in relation to physical age or maturity. Here, there was no dispute that E.B.'s maturity level was consistent with her young age. There is no claim that she possessed an advanced level of maturity, and she described Uhre's abuse in simple, childlike terms.

[¶27.]        It is certainly possible that a court might desire, or even need, the benefit of expert testimony in a different case to help it assess a child's maturity and susceptibility to trauma. Here, however, given E.B.'s young age, the language she used to report the abuse, and her behavior during the forensic interviews, we accept the circuit court's finding that E.B. would experience trauma.

[¶28.]    In addition, the circuit court's partial closure was no broader than necessary to protect E.B. from unnecessary trauma during her testimony. Under the circuit court's order, only members of the general public were excluded during E.B.'s testimony. The parties, counsel, E.B.'s family, a victim assistant, and members of the media were all allowed to remain in the courtroom. *See Rolfe II*, 2014 S.D. 47, ¶ 16, 851 N.W.2d at 903 ("Because the courtroom remained open to the representatives of the media, the closure in this case did not 'implicate the same secrecy and fairness concerns' as a total closure.") (quoting *Rolfe I*, 2013 S.D. 2, ¶ 22, 825 N.W.2d at 907). Further, E.B.'s testimony accounts for approximately 10 of the 380 pages of trial testimony. Within the realm of courtroom closures, this closure was comparatively modest in its scope and no more restrictive than necessary to protect E.B.'s. welfare.

[¶29.]    Short of not ordering a closure at all, we are unable to conceive of another alternative available to the circuit court that was more favorable to Uhre. For instance, utilizing closed circuit video during E.B.'s testimony would have been more, not less, restrictive under the circumstances of this partial courtroom closure. The procedure would have also implicated other Sixth Amendment concerns by preventing face-to-face confrontation. *See United States v. Yazzie*, 743 F.3d 1278, 1290 (9th Cir. 2014) ("Two-way closed circuit television or videotaped depositions . . . prohibit face-to-face confrontation during cross-examination and raise substantial Confrontation Clause issues.").

[¶30.]    Finally, the circuit court made findings on the record supporting its decision to grant the State's motion for the partial closure after a hearing on the

matter and briefing from the parties. Though the court's findings were not extensive, they were, nevertheless, adequate to support the partial closure. The need for clear findings, as described, in *Waller* is not, itself, a doctrinal element used to test the constitutionality of a courtroom closure. It is, instead, a practical rule of necessity to permit meaningful appellate review. Here, our ability to review the circuit court's *Waller* analysis was not impacted by the lack of more expansive findings. The court's findings here were either based upon basic undisputed information contained in the record or reasonable inferences drawn from it. Indeed, though he finds the circuit court's analysis to be too spare, Uhre does not argue that the findings are clearly erroneous.

[¶31.]     Instead, Uhre's principal argument is that the court's findings lack a sufficient evidentiary basis because they are not based upon a discrete record developed at an evidentiary hearing to consider partially closing the courtroom. In our view, however, the absence of an evidentiary hearing focused solely upon the courtroom closure issue does not render the circuit court's analysis infirm. Although a court may, in some cases, perceive the need to take evidence on the issue of whether to close the courtroom, we are reluctant to impose such a categorical procedural requirement for partial courtroom closures.[4]

[¶32.]     In a related argument concerning the factual basis for the circuit court's partial closure analysis, Uhre objects to the use of any of Strand's testimony provided at the pretrial hearing to determine the reliability of E.B.'s hearsay

---

4.    The provisions of SDCL 23A-24-6 explicitly require a hearing in the event the court considers a more complete form of courtroom closure that would exclude "the news media or the victim's parents or guardian[.]"

forensic interviews. He claims he did not have notice that Strand's testimony could be used for the additional purpose of supporting the court's decision to partially close the courtroom. We can appreciate the argument on general principles, and it might have more persuasive force if the material from the pretrial hearsay hearing that also supported the *Waller* analysis was controverted or the subject of debate between the parties. We do not understand that to be the case, though, for the basic, limited information implicated by Strand's pretrial testimony.

[¶33.] Because we find no violation of Uhre's Sixth Amendment right to a public trial, it is unnecessary to address his argument that the United States Supreme Court's decision in *Weaver* requires a new trial for violations of the public trial right rather than a remand for additional findings under *Waller*.

### *Motion to Suppress*

[¶34.] Uhre's claim that the court erred when it denied his motion to suppress his statement to Special Agent Garland potentially implicates his Fifth and Sixth Amendment rights to counsel and his Fifth Amendment right against self-incrimination. In order to further these protections, the United States Supreme Court created the well-known *Miranda* rule as a prophylaxis, requiring police officers to advise suspects of their rights and to terminate custodial questioning of an individual if he requests the assistance of counsel. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 1628, 16 L. Ed. 2d 694 (1966). The United States Supreme Court extended these protections in *Edwards v. Arizona* when it held that police officers may not reinitiate questioning once the accused requests counsel "until counsel has been made available" to him. 451 U.S. at 485–85, 101 S. Ct. at 1884–

85; *see also Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S. Ct. 486, 488, 112 L. Ed. 2d 489 (1990) (providing additional analysis on the *Edwards* rule as applied to attorney consultations). The United States Supreme Court has since modified the *Edwards* rule to allow law enforcement officers to reinitiate questioning after a two-week break in custody. *Maryland v. Shatzer*, 559 U.S. 98, 109, 130 S. Ct. 1213, 1222, 175 L. Ed. 2d 1045 (2010).

[¶35.]     Like the progenitor *Miranda* decision, the bright-line rule of *Edwards* applies only to custodial questioning. *Edwards*, 451 U.S. at 485–86, 101 S. Ct. at 1884–85 ("The Fifth Amendment right identified in *Miranda* is the right to have counsel present at any custodial interrogation."); *see also State v. Hoadley*, 2002 S.D. 109, ¶ 26, 651 N.W.2d 249, 256 ("The purpose of the Fifth Amendment right to counsel is to protect individuals from self-incrimination and assist in the custodial interrogation process."); *United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir. 1998) ("Absent either a custodial situation or official interrogation, *Miranda* and *Edwards* are not implicated."). Therefore, if a court finds that a defendant was not in custody, it does not reach the question of whether an accused validly invoked his rights to remain silent or to have counsel present. We examine whether a defendant was subject to a custodial interrogation by using a two-part test: (1) "what were the circumstances surrounding the interrogation" and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *State v. Hopkins*, 2017 S.D. 13, ¶ 8, 893 N.W.2d 536, 539–40 (quoting *State v. McCahren*, 2016 S.D. 34, ¶ 30, 878 N.W.2d 586, 599).

[¶36.]     Here, even if Uhre sought the assistance of counsel during his July 7, 2015, telephone interview with Deputy Bostrom, he was most assuredly not in custody. Though not central to the application of *Edwards*, Uhre was also not in custody when he spoke to Special Agent Garland over seven months later, on February 22, 2016. The interview was conducted in Garland's vehicle at Uhre's request. Garland told Uhre he was not under arrest and repeatedly advised Uhre he could get out of the vehicle and end the interview at any time. Under the circumstances, we conclude that Uhre's interview with Special Agent Garland was non-custodial in nature. The interview was voluntary, and a reasonable person would have felt free to leave. Accordingly, the circuit court's factual determination that Uhre was not in custody is free of any clear error, and the court's application of *Edwards* was correct.

[¶37.]     Uhre acknowledges the absence of custody, but asks us to extend the *Edwards* rule to prohibit police officers from reinitiating questions whenever an accused has previously sought the assistance of a lawyer. We decline to do so.

[¶38.]     Accepting Uhre's invitation to overlook the absence of custody would effectively disconnect *Edwards* from its principal rationale, which is to "prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Montejo v. Louisiana*, 556 U.S. 778, 787, 129 S. Ct. 2079, 2085, 173 L. Ed. 2d 955 (2009) (quoting *Michigan v. Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 1180, 108 L. Ed. 2d 293 (1990)). Here, Uhre does not claim on appeal that Special Agent Garland badgered him—only that he could not reinitiate questioning because Uhre expressed a desire to have an attorney present when he spoke by

telephone to Deputy Bostrom over seven months earlier. Such a categorical bar to reinitiating questioning prior to a criminal charge is unsupported by the decisions of the United States Supreme Court or our jurisprudence. Indeed, the argument seems at odds with the Supreme Court's decision in *Shatzer*, which recognized instances in which police officers could, indeed, reinitiate questioning despite a suspect's earlier invocation of *Miranda* rights. 559 U.S. at 110, 130 S. Ct. at 1223.

[¶39.] Under the circumstances, therefore, it is unnecessary to address the question of whether Uhre unequivocally invoked his right to counsel or the details of Attorney Rohl's communication with Deputy Bostrom. Simply put, the absence of any custodial interrogation renders Uhre's argument unsustainable under *Miranda* and *Edwards*.

[¶40.] We affirm.

[¶41.] GILBERTSON, Chief Justice, and KERN and JENSEN, Justices, concur.