#29933-a-JMK
**2023 S.D. 7**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                     Plaintiff and Appellee,

   v.

JERREN DONALD MANNING,                     Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
BROWN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE GREGG C. MAGERA
Judge

* * * *

THOMAS J. COGLEY
Aberdeen, South Dakota                     Attorney for defendant
                                           and appellant.


MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
Solicitor General
Pierre, South Dakota                       Attorneys for plaintiff and
                                           appellee.

* * * *

                                           CONSIDERED ON BRIEFS
                                           OCTOBER 3, 2022
                                           OPINION FILED **02/01/23**

#29933

KERN, Justice

[¶1.] In May 2019, a jury found Jerren Manning guilty of two counts of first-degree rape and two counts of sexual contact with a child under the age of sixteen. The court sentenced Manning only on the rape convictions, imposing two consecutive sixty-year terms in the state penitentiary. Manning appeals, raising multiple issues including that there was insufficient evidence to support his convictions, that the submission of the sexual contact charges to the jury violated the prohibition against double jeopardy, that the court allowed improper bolstering of witnesses, that the courtroom was improperly closed to the public during voir dire, and that he was denied effective assistance of counsel. Further, Manning claims that his sentence is cruel and unusual in violation of the Eighth Amendment and constitutes an abuse of discretion. We affirm.

## Facts and Procedural History

[¶2.] In 2017, Jeremy and Amanda Ahoe lived in Aberdeen along with their three children, A.A. age eight, B.A. age six, and S.A. age three. Jeremy owned a construction and rental company, and Amanda worked as a certified nursing assistant. Manning, who was married with one child, also lived and worked in Aberdeen. Jeremy and Manning were close friends, with Jeremy serving as the best man in Manning's wedding. Manning would often pick up A.A. and B.A. after school and babysit all three children at the Ahoe home for a few hours until one of their parents got home from work or Manning had to leave for work. At times, Manning watched the children up to four days a week.

-1-

[¶3.] On multiple occasions, Jeremy would come home after work and find Manning alone with B.A. in her upstairs bedroom while his other two daughters were in different parts of the house. In the fall of 2018, Jeremy came home from work early one day and discovered that the door to his office, located on the main floor of their home, was closed. He opened the door and found B.A. and Manning alone in the office. Although he was suspicious, Jeremy did not immediately confront Manning about the situation, but instead returned to work.

[¶4.] Later that evening, Jeremy asked B.A. about being alone in the office with Manning. B.A. eventually disclosed to both her parents that Manning had touched her, but she did not describe the extent of the touching. Amanda stated that B.A. was "sad and overwhelmed" when she talked about what happened. Jeremy and Amanda debated back and forth about what to do with this information and decided not to call law enforcement. Amanda, however, did call the school and inform them that Manning was no longer permitted to pick up the children.

[¶5.] On the afternoon of October 4, 2018, Officer Jordan Mejeske of the Aberdeen Police Department was contacted by the principal of the Ahoe girls' elementary school, who informed him that a student had reported a possible sexual assault of her sister. Officer Mejeske went to the school and talked to the principal, the school counselor, and the reporting student's teacher, but did not meet with either A.A. or B.A. He then contacted the Central South Dakota Child Assessment Center (CAC) to set up a forensic interview for B.A. He also contacted Amanda and told her that law enforcement would be investigating the report and that she should not discuss the situation with the children.

[¶6.]        B.A. was interviewed and examined on October 11, 2018, at the CAC by Angela Lisburg, a family nurse practitioner. During the interview, B.A. stated that Manning had touched her more than one time. B.A. explained that sometimes Manning would do the touching upstairs at their house, and sometimes downstairs in her dad's office. B.A. said that Manning would touch her with his private part, that sometimes it would go in her bottom, and that Manning put his private part in her bottom more than one time. She stated that Manning would pull her clothes "half down" when he put his private part in her bottom. Lisburg asked B.A. how it felt when Manning's private part was in her bottom, to which she replied, "Not that really bad, but it does hurt." According to B.A., Manning would be on his knees and B.A. would sometimes be laying down on her back and sometimes on her stomach. She said that sometimes she was on her tummy on the chair in the office and Manning would give her his phone so that she could play a game. While she was on the phone, he would put his private part in her bottom.

[¶7.]        B.A. stated that there was one time her daddy "noticed" that she was alone in the office with Manning. That time, she was in the office laying down on her back with the door to the office closed. Her dad came into the house, so she had to pull her pants up and Manning put his private part back in his pants before her dad came into the office. Lisburg asked B.A. if Manning or her dad said anything, and B.A. replied "no."

[¶8.]        Lisburg also asked B.A. about the touching that happened upstairs, and B.A. stated that "it's the same thing" as happened downstairs. B.A. explained that the touching upstairs would occur in her bedroom on the bed and that it

happened more than one time. B.A. described lying on her back on the bed, with Manning kneeling on the floor. Later in the interview, B.A. indicated that Manning would tell her to "lay down and lift yourself up." When later asked to clarify this, B.A. said "I would be lifting my legs up and he would tell me to put them on his shoulder."

[¶9.] B.A. recounted that on one occasion she was upstairs looking for a battery when Manning came into the room and told her to come lie down on her bed. She told him no. Lisburg asked B.A. to describe this incident in more detail. B.A. said that Manning picked her up and told her that if she did not lie down he would not come over again. She said she was scared because he said it in a mean voice. She said that her sister was coming upstairs, and she pulled her pants up. When asked to clarify what Manning did in the bedroom, she said he "did the same thing as he does every single time."

[¶10.] Lisburg asked B.A. if anything ever came out of Manning's private part, and B.A. responded that white stuff would come out and go on Manning's hands. He would have to wash his hands a lot to get it off. Sometimes it would spill on the ground next to the chair in the office and Manning would use a baby wipe to clean it up. He would then flush the baby wipe down the toilet. Lisburg asked B.A. to describe what Manning's body would be doing when his private part was in her bottom. B.A. responded that it would be "going forward." B.A. also stated that sometimes Manning would tell her not to tell her dad.

[¶11.] After the interview, several items of physical evidence and samples believed to contain potential DNA evidence were collected from the Ahoe home.

Investigators swabbed both the office chair and floor in Jeremy's office and sent the samples to the state laboratory in Pierre for testing.

[¶12.]        A Brown County grand jury indicted Manning specifying the type of crime and location of the offenses to wit: Count 1—first-degree rape in violation of SDCL 22-22-1(1) (anal penetration/office); Count 2—first-degree rape in violation of SDCL 22-22-1(1) (anal penetration/ bedroom); Count 3—sexual contact with a child under the age of sixteen in violation of SDCL 22-22-7 (penis to buttocks/office); Count 4—sexual contact with a child under the age of sixteen in violation of SDCL 22-22-7 (penis to buttocks/bedroom).

[¶13.]        A two-day jury trial began on May 22, 2019.  After opening statements*, the State called Officer Majeske, Kristina Dreckman (a forensic scientist from Pierre), Amanda, Jeremy, A.A., B.A., and Lisburg.  Manning called his ex-wife and testified on his own behalf.

[¶14.]        Amanda testified about Manning's willingness to babysit the girls, stating that he once offered to watch them overnight.  The offer arose after Manning heard that she and Jeremy wanted to attend a concert in Sioux Falls.  Although Manning offered to stay overnight with the girls, Amanda testified that she was not comfortable leaving them with a male for this length of time.  After they had decided not to go because they did not have a babysitter, Manning kept "pushing the idea of babysitting them."  He even told Amanda that he thought about buying the tickets for them so that they could attend.

---

*        Manning initially reserved his right to make an opening statement, but after the close of the State's case he waived this right, instead proceeding directly with his case-in-chief.

[¶15.] Amanda also testified that on one occasion Manning came over to help her clean the house, something he had never done before. He told her that he felt obligated to help her because he had stayed at their home after he and his wife had an argument. Amanda relayed that Manning cleaned the kitchen and was scrubbing the floors when she left for work that day. The children later told her that Manning cleaned the office as well. Amanda testified that she found rugs from the office hanging outside after they had apparently been hosed down.

[¶16.] Jeremy testified about the times he had found B.A. and Manning alone in the office and bedroom together. Regarding the occasion where he found Manning alone with B.A. in the office, he testified that when he opened the door B.A. ran to the other side of the room, prompting him to ask Manning, "what's going on?" to which Manning "didn't really reply." Jeremy also testified that he and his wife had sex in the office on multiple occasions, which was likely why investigators found his sperm cell DNA in the office. Amanda confirmed this activity, testifying that she and Jeremy often had sex in the office because it had a door which they could lock to ensure the children did not enter the room. Jeremy also testified that he had never asked Manning to clean the floor in the office.

[¶17.] A.A., who was nine years old at the time of trial, testified that she knew B.A. and Manning had been alone in the office of their home with the door closed. She also testified that on one occasion when she was checking on B.A.'s whereabouts, she saw Manning in B.A.'s bedroom pulling up her pants.

[¶18.] B.A., who was seven at the time of trial, testified, albeit very briefly. The State engaged in a short colloquy with her to establish that she knew the

difference between the truth and a lie. B.A. promised that everything she would say in court would be the truth, and the circuit court placed her under oath. B.A. acknowledged that she knew Manning because he babysat her and her sisters. She also agreed that something bad happened while he was at the house. The State asked B.A. if she told Lisburg during the recorded interview about the things that happened with Manning and if what she told Lisburg was the truth. B.A. testified that she did tell Lisburg about what happened and that she told the truth. The State then asked B.A. what Manning did with his private part and she whispered that Manning put his private part in her bottom. The State ended its examination and Manning's counsel did not cross examine B.A. After B.A.'s testimony, the State offered the DVD of B.A.'s forensic interview which was played for the jury.

[¶19.] The State next called Lisburg, who testified about her credentials as a family nurse practitioner and her extensive experience interviewing children. In addition to conducting B.A.'s forensic interview, she also physically examined her genitalia and perianal regions. Lisburg's examination revealed no signs of physical trauma. Lisburg testified that in the majority of child sexual abuse cases it is normal to find no signs of physical trauma. She explained that this occurs because the tissues in these areas heal "very quickly and often completely without any evidence of scarring."

[¶20.] The State also called Kristina Dreckman, a forensic scientist at the South Dakota State Forensic Lab. She testified that she received several items that had been collected from the Ahoe home. After briefly explaining the nature of DNA to the jury, Dreckman stated that of the items collected, only two contained DNA

evidence. A swab taken from a chair in the office contained a DNA mixture from three individuals, the major contributor being Amanda. Manning, Jeremy, and B.A. were all excluded as contributors to that sample. The other sample, taken from a stain on a floor mat in the office, revealed sperm cell DNA matching Jeremy and excluding Manning.

[¶21.] At the conclusion of the State's case, Manning moved for a judgment of acquittal on all counts, contending there was insufficient evidence to sustain the allegations. The circuit court denied the motion.

[¶22.] In his defense, Manning first called his ex-wife, Breana Olson. She was asked about her sexual intimacy with Manning and the size of his penis. She described it as around eight or nine inches long with a width a little less than a silver dollar. She described experiencing a tear in her vaginal area prior to their marriage as a result of sexual penetration by Manning. On cross examination, she testified that Manning preferred small breasts and shaved pubic hair.

[¶23.] Manning testified in his own defense. He stated that the only time he had been alone in a room with any of the girls was the day that Jeremy came home early and found him in the office with B.A. He explained that after he picked the girls up from school and took them home, he was in the office. B.A. opened the door and came into the office asking for some chapstick. Because of the weight of the coats hanging on the back of the office door, Manning testified that it bounced back and partially closed. He said he hung out in the office because Jeremy allowed him to smoke pot in there. He also testified that the day he cleaned the rugs and mat in the office, Jeremy had asked him to do so. He denied ever sexually abusing B.A.

On cross-examination he acknowledged that B.A. was raped by someone, as she described, but reiterated that he was not the perpetrator. He also claimed his penis was so large that it would have caused physical trauma to B.A. if he had in fact committed the alleged sexual acts.

[¶24.] The jury returned a verdict finding Manning guilty of all four counts. Manning admitted the part II information alleging that he was a habitual offender, having been convicted in 2010 of felony child abuse. The court ordered a presentence investigation report and a psychosexual evaluation and scheduled a sentencing hearing for July 17, 2019. At the beginning of the hearing, the State requested that the circuit court sentence Manning on only the rape convictions because the sexual contact convictions were based on the same factual circumstances as the rape charges. Defense counsel did not object but requested that the court "either strike or vacate" the sexual contact convictions. The court denied the request to vacate but only entered judgments of conviction and sentences on the rape convictions. The court sentenced Manning to serve sixty years in the state penitentiary on each of the rape counts to be served consecutively.

[¶25.] Manning's trial counsel filed a notice of appeal on July 19, 2019, but then moved for substitute counsel to handle the direct appeal. The circuit court appointed new counsel, but this Court dismissed the appeal on December 3, 2019, after Manning failed to file a brief. Manning later filed a pro se petition seeking a writ of habeas corpus alleging ineffective assistance of counsel as a result of his attorney's failure to pursue his appeal. Manning was appointed new counsel, and the circuit court agreed to issue an order vacating Manning's sentence so that he

could be resentenced in order to restore his right to appeal. A hearing was held on January 26, 2022, at which the circuit court resentenced Manning to the same sentence originally given and issued amended judgments of conviction for the two rape counts.

[¶26.] Manning raises a number of issues on appeal which we consolidate and restate as follows:

1. Whether the circuit court erred by denying Manning's motion for judgment of acquittal on the two rape charges.

2. Whether the circuit court erred by denying Manning's motion for judgment of acquittal on the two sexual contact charges in violation of the constitutional prohibition against double jeopardy.

3. Whether there was improper bolstering of witnesses at trial by the circuit court and the prosecution.

4. Whether the circuit court improperly closed the courtroom during the jury selection phase of Manning's trial.

5. Whether Manning's sentence violates the Eighth Amendment or constitutes an abuse of discretion.

6. Whether Manning received ineffective assistance of counsel.

7. Whether Manning was deprived of a fair trial by the cumulative effect of the alleged errors.

### Analysis

***1. Whether the circuit court erred by denying Manning's motion for judgment of acquittal on the two rape charges.***

[¶27.] Manning first challenges the circuit court's denial of his motion for judgment of acquittal. "Denial of a motion for judgment of acquittal is reviewed de

novo." *State v. Nelson*, 2022 S.D. 12, ¶ 21, 970 N.W.2d 814, 823 (quoting *State v. Ware*, 2020 S.D. 20, ¶ 12, 942 N.W.2d 269, 272). "We consider 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *State v. Snodgrass*, 2020 S.D. 66, ¶ 51, 951 N.W.2d 792, 808). In doing so, we "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). This is because "the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* (quoting *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288). "[W]e accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* "If the evidence, including circumstantial evidence and reasonable inferences drawn therefrom sustains a reasonable theory of guilt, a guilty verdict will not be set aside." *State v. Otobhiale*, 2022 S.D. 35, ¶ 37, 976 N.W.2d 759, 772 (quoting *State v. Stone*, 2019 S.D. 18, ¶ 38, 925 N.W.2d 488, 500).

[¶28.] The jury convicted Manning of two counts of rape in the first degree in violation of SDCL 22-22-1(1). Rape in the first degree is "an act of sexual penetration . . . if the victim is less than thirteen years of age[.]" *Id.* It is uncontested that B.A. is under the age of thirteen. Sexual penetration is defined as "an act, however slight, of sexual intercourse, . . . anal intercourse, or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2.

[¶29.]     Manning argues that the evidence is insufficient to establish penetration because the DNA evidence excludes him as the source of the semen found in the office and that a penis of his size would leave evidence of trauma on a seven-year-old victim, which was not present.

[¶30.]     Regarding the first count of rape that occurred in the office, B.A.'s testimony taken alone is sufficient to sustain the conviction. "[W]hen a conviction turns in large part upon the credibility of witnesses, a circuit court properly leaves 'to the jury the pervasive issue of credibility and considering the evidence as a whole[.]'" *Seidel*, 2020 S.D. 73, ¶ 36, 953 N.W.2d at 314 (quoting *State v. Guthrie*, 2001 S.D. 61, ¶ 50, 627 N.W.2d 401, 422). B.A. acknowledged that bad things happened with Manning and when asked what happened she told the jury that Manning put his private part in her bottom. In addition, B.A.'s forensic interview, which was played for the jury, contained B.A.'s description of how Manning's private part went in her bottom. If the jury believed this evidence, as it appears they did, then the penetration element is effectively established, and this evidence alone is sufficient to find Manning guilty of first-degree rape.

[¶31.]     Although "there is no requirement that the testimony of a child witness be corroborated," *State v. Smiley*, 2004 S.D. 119, ¶ 6, 689 N.W.2d 427, 429, there were other facts presented at trial to support B.A.'s testimony. Her statements were corroborated by testimony from her father who found B.A. and Manning alone together in the office with the door closed when he came home unexpectedly from work. The testimony from Amanda about Manning encouraging her and Jeremy to go to a concert in Sioux Falls so that he could babysit the girls

overnight and Manning's decision to hose down the rugs from the office further corroborates B.A.'s story. A.A.'s testimony that B.A. and Manning were alone in the office with the door closed along with Olson's testimony about Manning's sexual preferences also substantiate B.A.'s account.

[¶32.] The second count of rape that occurred in the bedroom upstairs can also be sustained by B.A.'s testimony alone. While the only evidence of penetration on this charge is B.A.'s statements in her interview that "the same thing" happened in her bedroom as happened in the office and that Manning "did the same thing as he does every single time," a reasonable inference can be drawn from these statements that penetration took place in the bedroom as well. Reasonable inferences can also be made from B.A.'s statements during her interview about white stuff coming out of Manning's private part and him having to wash his hands a lot to remove it to show that he committed this crime. B.A.'s account of lifting her legs up and Manning telling her to put her legs on his shoulder when they were in her bedroom would also support the jury's conclusion of Manning's guilt. B.A.'s statements are corroborated here by A.A.'s testimony that she walked into B.A.'s bedroom on one occasion as Manning was pulling B.A.'s pants up.

[¶33.] Manning's argument that a penis his size would leave evidence of trauma was disputed by Lisburg who testified that the lack of physical trauma was the norm in sexual abuse cases. Further, the jury was not obligated to accept Manning's theory regarding the absence of any physical trauma as evidence that the crimes did not occur. Additionally, the lack of DNA evidence does not prevent the jury from finding him guilty through other evidence. Taking the evidence in the

light most favorable to the prosecution, there was sufficient evidence to convict Manning of both rape charges. The circuit court did not err in denying Manning's motion for judgment of acquittal on these counts.

> **2.      Whether the circuit court erred by denying Manning's motion for judgment of acquittal on the two sexual contact charges in violation of the constitutional prohibition against double jeopardy.**

[¶34.]      Manning next argues that the circuit court should have granted his motion for judgment of acquittal on the sexual contact charges because they were based on the same conduct as the rape charges. He claims the submission of these charges to the jury violated his right to be free from double jeopardy. Both the United States Constitution and the South Dakota Constitution forbid double jeopardy. U.S. Const. amend. V; S.D. Const. art. VI, § 9. "These provisions shield criminal defendants from both multiple prosecutions and multiple punishments for the same criminal offense if the Legislature did not intend to authorize multiple punishments in the same prosecution." *State v. Bausch*, 2017 S.D. 1, ¶ 26, 889 N.W.2d 404, 412 (quoting *State v. Dillon*, 2001 S.D. 97, ¶ 13, 632 N.W.2d 37, 43). "The prohibition against double jeopardy . . . 'protect[s] against three types of governmental abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.'" *State v. Babcock*, 2020 S.D. 71, ¶ 31, 952 N.W.2d 750, 760 (quoting *State v. Garza*, 2014 S.D. 67, ¶ 10, 854 N.W.2d 833, 837). Only the third type of abuse is at issue here.

[¶35.]      This Court has stated, "[w]e do not believe that the legislature intended the sexual contact statute to apply to touching incidental to rape." *State v.*

*Brammer*, 304 N.W.2d 111, 114 (S.D. 1981). When the charges alleged relate to the same act, "the offenses of rape and sexual contact are mutually exclusive." *Id.* Therefore, a defendant may not receive multiple punishments for rape and sexual contact with a minor under the age of sixteen arising out of the same conduct.

[¶36.]      Here, the indictment included one count of rape and one count of sexual contact for the conduct in the office. It also included one count of rape and one count of sexual contact for the conduct in the bedroom. The jury found Manning guilty of all four counts. The charges were not made in the alternative nor were they required to be. What the double jeopardy clause prohibits is "multiple punishments for the same offense." *Babcock*, 2020 S.D. 71, ¶ 31, 952 N.W.2d at 760 (quoting *Garza*, 2014 S.D. 67, ¶ 10, 854 N.W.2d at 837). The State is not required to pick between two viable theories that are supported by the evidence. In Manning's case, the circuit court emphasized that Manning was being sentenced only on the rape charges. Although Manning relies on *Brammer* and *Bausch* to support his claim that his rights were violated, the cases are distinguishable. In both cases, this Court vacated sexual contact convictions and sentences arising out of the same conduct on which the defendant was also convicted and sentenced for rape. *Brammer*, 304 N.W.2d at 114-15; *Bausch*, 2017 S.D. 1, ¶ 29, 889 N.W.2d at 413. Here, because there were no judgments of conviction entered on the sexual contact charges and Manning was not sentenced on those charges, Manning's double jeopardy rights were not violated.

[¶37.]      Nonetheless, Manning contends that the sole fact that the State pursued four crimes against him instead of two constitutes a violation of his double

jeopardy rights. Manning claims that his indictment was multiplicitous. "Multiplicity . . . is the splintering of a single offense into separate counts in an indictment." *Babcock*, 2020 S.D. 71, ¶ 31, 952 N.W.2d at 760 (quoting *State v. Muhm*, 2009 S.D. 100, ¶ 19, 775 N.W.2d 508, 514). "The 'principal danger that the multiplicity doctrine addresses' is the risk that a defendant might receive multiple punishments for a single offense." *U.S. v. Roy*, 408 F.3d 484, 492 (8th Cir. 2005) (quoting *U.S. v. Webber*, 255 F.3d 523, 527 (8th Cir. 2001)). Manning did not receive multiple punishments for a single offense. Further, because rape and sexual contact are two separate offenses that are mutually exclusive if based on the same underlying conduct, they are not multiplicitous. The circuit court did not err by denying Manning's motion for judgment of acquittal.

### 3. Whether there was improper bolstering of witnesses at trial by the circuit court and the prosecution.

[¶38.] Next, Manning alleges that the court and the prosecution improperly vouched for the credibility of the child witnesses in this case. "Improper vouching 'invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully.'" *Snodgrass*, 2020 S.D. 66, ¶ 45, 951 N.W.2d at 806 (quoting *State v. Goodroad*, 455 N.W.2d 591, 594 (S.D. 1990)). It is well established that it is within "the exclusive province of the jury to determine the credibility of a witness." *Id.* (quoting *State v. McKinney*, 2005 S.D. 73, ¶ 32, 699 N.W.2d 471, 481).

[¶39.] At the beginning of A.A.'s testimony, the circuit court had a colloquy with her in the presence of the jury in which it discussed the difference between the truth and a lie and the importance of telling the truth in court. The State conducted a similar colloquy at the beginning of B.A.'s testimony, also in the

presence of the jury. Manning submits that these exchanges improperly bolstered the credibility of the witnesses. He also contends that the prosecutor improperly vouched for B.A.'s credibility during closing argument when he stated:

> Now, why should you believe [B.A.'s] testimony? That's the number one thing we're here for. Why should you believe it? Well, [B.A.] came up here, she testifies under oath. You heard us go through the whole colloquy about what it means to tell the truth, the difference between truth and a lie. She talked about all those things with me. She talked about it a little bit with the judge. She told the judge I promise you I'm going to talk about only the truth in here today.
> . . . She knew people get in trouble if they don't tell the truth. She told us that. When she doesn't tell the truth at home, she gets in trouble.

[¶40.] Manning did not object to either colloquy prior to the children's testimony, nor did he object to the statements in the State's closing argument. "[W]hen 'an issue has not been preserved by objection at trial,' this Court may conduct a limited review to consider 'whether the circuit court committed plain error.'" *State v. Bryant*, 2020 S.D. 49, ¶ 19, 948 N.W.2d 333, 338 (quoting *State v. Buchhold*, 2007 S.D. 15, ¶ 17, 727 N.W.2d 816, 821). "To establish plain error, an appellant must show (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *State v. McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d 725, 729–30).

[¶41.] Here, the colloquies could not be categorized as improper vouching, and the court did not err by permitting them. Ensuring that a child witness understands the difference between the truth and a lie is different than ensuring the jury that the witness's statements are true. Requiring child witnesses to

promise that they will tell the truth in an age appropriate fashion is "the same promise" any other witness makes at trial when they take an oath to tell the truth. *See State v. Westerfield*, 1997 S.D. 100, ¶ 12, 567 N.W.2d 863, 867 (quoting *United States v. Leslie*, 759 F.2d 366, 378 (5th Cir. 1985) (noting that a provision in a plea agreement requiring a witness to testify "truthfully" does not rise to the level of improper vouching because it is the same promise made by anyone testifying at trial).

[¶42.] As for the statements made in the State's closing, "the State is permitted to make fair comments on the credibility of witnesses during final argument." *Jenner v. Leapley*, 521 N.W.2d 422, 428 (S.D. 1994). The statements made by the prosecutor concentrated more on what was actually said during the colloquy and did not express "a direct opinion as to whether the child[] [was] telling the truth." *State v. Koepsell*, 508 N.W.2d 591, 593 (S.D. 1993). Indeed, the statements about B.A. understanding that telling a lie could get her in trouble were made in the specific context of foundational questioning to ensure B.A. understood the moral obligation to tell the truth. This was not an argument in which the prosecutor was attempting to bolster an adult's testimony with the suggestion that the witness would run the risk of punishment or adverse consequences if the witness did not tell the truth. For these reasons, there was not an improper bolstering of witnesses.

### 4. Whether the circuit court improperly closed the courtroom during the jury selection phase of Manning's trial.

[¶43.] Manning contends that he is entitled to a new trial because the courtroom was closed during the voir dire phase of his jury trial. "A violation of the right to a public trial is among the narrow class of errors regarded as structural, and it is, therefore, not subject to further review for harmlessness." *State v. Uhre*, 2019 S.D. 8, ¶ 12, 922 N.W.2d 789, 795. A structural error "necessarily renders a trial fundamentally unfair" to the point that "automatic reversal is required." *Guthmiller v. Weber*, 2011 S.D. 62, ¶ 16, 804 N.W.2d 400, 406. The United States Supreme Court has identified a violation of the right to a public trial as a structural error. *Id.* (citing *Neder v. U.S.*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999)). The right to a public trial extends to the voir dire stage of trial. *Presley v. Georgia*, 558 U.S. 209, 213, 130 S. Ct. 721, 724, 175 L. Ed. 2d 675 (2010).

[¶44.] Manning bases his contention that the courtroom was closed on a non-notarized "affidavit" provided by his mother, Tammy Dudley, dated August 5, 2021—more than two years after Manning's trial. Dudley asserted that she attempted to attend jury selection but was told that no one was allowed in the courtroom. She stated that there was a piece of paper hanging by the courtroom door that said "closed" next to Manning's name.

[¶45.] Relying on the document from his mother, Manning filed a motion for a new trial on September 7, 2021. A motion for new trial must be served and filed within ten days after the filing of the judgment. SDCL 23A-29-1. Manning requested this motion to be held in abeyance until the amended judgments of

conviction were issued. It is unclear whether this motion was addressed at the January resentencing hearing, as no transcript of this hearing is contained in the record. Further, there is no order in the record granting or denying the motion for new trial. However, "SDCL 15-6-59(b) permits a circuit court to take no action on a motion for a new trial, and a motion for a new trial is deemed automatically denied if the circuit court fails to timely rule upon the motion." *State v. Timmons*, 2022 S.D. 28, ¶ 20, 974 N.W.2d 881, 888. A denial of a motion for a new trial is reviewed under the abuse of discretion standard. *Id.* ¶ 19.

[¶46.] There is no evidence in the record to corroborate Dudley's unsworn statement. There is no mention at any point in the trial transcript of the courtroom being closed, nor is there a closure order in the record. Further, Manning acknowledged in his motion for new trial that if the courtroom was ever closed, he and his counsel were unaware of it. Based on this lack of evidence, we conclude that the circuit court did not abuse its discretion by denying Manning's motion for a new trial.

### 5. *Whether Manning's sentence violates the Eighth Amendment or constitutes an abuse of discretion.*

[¶47.] The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment[.]" U.S. Const. amend. VIII. This restriction applies to the states through the Fourteenth Amendment. "[W]hen the question presented is whether a challenged sentence is cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review." *State v. Chipps*, 2016 S.D. 8, ¶ 31, 874 N.W.2d 475, 486.

[¶48.] In determining whether a noncapital sentence is in violation of the Eighth Amendment, we must decide whether the sentence is "grossly disproportionate to its corresponding offense." *State v. Rice*, 2016 S.D. 18, ¶ 13, 877 N.W.2d 75, 80 (citing *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). "To do so, we first compare the gravity of the offense—i.e., 'the offense's relative position on the spectrum of all criminality'—to the harshness of the penalty—i.e., 'the penalty's relative position on the spectrum of all permitted punishments.'" *Id.* (quoting *Chipps*, 2016 S.D. 8, ¶¶ 35–38, 874 N.W.2d at 489). This analysis will "typically mark[] the end of our review" as gross disproportionality is rarely found. *Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 489 (quoting *State v. Garreau*, 2015 S.D. 36, ¶ 9, 864 N.W.2d 771, 775). However, "[i]f the penalty imposed appears to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as those 'imposed for commission of the same crime in other jurisdictions.'" *Id.* (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)).

[¶49.] We begin by examining the gravity of the offense. Manning was convicted of two counts of first-degree rape. "Rape is a heinous crime[.]" *State v. Yeager*, 2019 S.D. 12, ¶ 6, 925 N.W.2d 105, 109. "Child rape 'may be devastating in [its] harm,'" to the individual victim. *Id.* (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 407, 128 S. Ct. 2641, 2644, 171 L. Ed. 2d 525 (2008)). Along with any physical injury to the victim, rape can also cause grievous "mental and psychological

damage. Because it undermines the community's sense of security, there is public injury as well." *Id.* (quoting *Coker v. Georgia*, 433 U.S. 584, 598, 97 S. Ct. 2861, 2869, 53 L. Ed. 2d 982 (1977)). Thus, it is clear that the gravity of Manning's crimes is comparatively high on the spectrum of all criminality.

[¶50.] Turning to the harshness of the sentence, the circuit court sentenced Manning to two consecutive sixty-year terms. First-degree rape is a class C felony which is punishable by up to life imprisonment in the state penitentiary in addition to a $50,000 fine. SDCL 22-22-1(1); SDCL 22-6-1(3). The spectrum of all permitted punishments in South Dakota includes the possibility of death and mandatory life imprisonment. Manning argues that his sentence is essentially a life sentence. Although this term of years is lengthy, and the sentence is at the higher end of the spectrum of all permitted punishments, Manning's term of years sentence when compared to the gravity of the offense, raping a child, is not grossly disproportionate, thus ending our review of his constitutional claim.

[¶51.] In addition to his Eighth Amendment challenge, Manning also argues that the circuit court abused its discretion in sentencing him to two sixty-year terms to be served consecutively. An abuse of discretion analysis differs from an Eighth Amendment analysis. "We generally review a circuit court's sentencing decision for an abuse of discretion." *State v. Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d 734, 740. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Id.* (quoting *State v. Holler*, 2020 S.D. 28, ¶ 10, 944 N.W.2d 339, 342).

[¶52.]    "Circuit courts have broad discretion in sentencing." *Klinetobe*, 2021 S.D. 24, ¶ 28, 958 N.W.2d at 741 (quoting *Holler*, 2020 S.D. 28, ¶ 17, 944 N.W.2d at 344). When fashioning an appropriate sentence, a circuit court should be guided by "the traditional sentencing factors of retribution, deterrence—both individual and general—rehabilitation, and incapacitation[,]" weighing them "on a case-by-case basis[.]" *Id.* (quoting *State v. Toavs*, 2017 S.D. 93, ¶ 10, 906 N.W.2d 354, 357). As part of its consideration, "[t]he sentencing court should have access to 'the fullest information possible concerning the defendant's life and characteristics. Information which should be available to the court includes general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record.'" *Id.* ¶ 29 (quoting *Holler*, 2020 S.D. 28, ¶ 18, 944 N.W.2d at 344).

[¶53.]    Here, we do not conclude that the circuit court abused its discretion in sentencing Manning. To assist in fashioning an appropriate sentence for Manning, the circuit court ordered court services to prepare a presentence investigation report (PSI) and obtain a psychosexual evaluation (PSE). The PSI contained, among other things, information regarding Manning's criminal history, family history, education, employment history, social circumstances, and attitudes/orientation. The PSE contained further information on topics such as Manning's mental state, personality functioning, psychosocial history, and psychosexual history. The circuit court noted at sentencing that it considered both reports when applying the traditional sentencing factors to arrive at its decision.

[¶54.]     There were many aggravating factors present in both reports that support the circuit court's decision to impose a lengthy sentence.  Manning has a prior felony conviction for abuse/cruelty to a minor less than seven years of age.  His juvenile criminal history includes an incident of sexual contact with a child under sixteen.  The psychosexual evaluator diagnosed Manning with antisocial personality disorder and pedophilic disorder with a poor prognosis for treatment.  Importantly, Manning was found to be a "high-risk for sexual reoffense," meaning that he is "a poor candidate for probation and/or community placement[,]" and rather should be placed in a "highly secure and structured setting[.]"  When being interviewed for the PSE, Manning continued to assert that he did not commit the crimes he was convicted of and was "unsure whether he would engage in sexual offender specific treatment programming" if it were offered.  The circuit court found that Manning had failed to accept responsibility for his crimes and that Manning was "a danger to the community and will likely reoffend."

[¶55.]     While the State recommended fifty years on each of the rape charges, the circuit court's sixty-year sentences were not beyond the range of permissible choices and in the court's view were necessary to protect the public.  The circuit court did not abuse its discretion in fashioning Manning's sentence.

### 6.     *Whether Manning received ineffective assistance of counsel.*

[¶56.]     Manning alleges that he was denied the effective assistance of counsel because of errors committed by his trial counsel: (1) during the jury selection process, (2) by not moving to dismiss multiplicitous counts in the indictment, and

(3) for not objecting to the bolstering of witnesses. He claims that the compilation of these errors prejudiced him at trial.

[¶57.]	As a general rule, "[a]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal. We depart from this principle only when trial counsel was so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights." *State v. Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 120-21 (quoting *State v. Golliher-Weyer*, 2016 S.D. 10, ¶ 8, 875 N.W.2d 28, 31). "This is because the record on direct appeal typically does not afford a basis to review the performance of trial counsel." *Id.* Rather, ineffective assistance claims are better heard through a writ of habeas corpus. *Id.* "[T]hrough habeas, an attorney charged with ineffectiveness can explain or defend actions and strategies[,] [a]nd this Court can obtain a 'more complete picture of what occurred.'" *Golliher-Weyer*, 2016 S.D. 10, ¶ 9, 875 N.W.2d at 31-32 (quoting *State v. Thomas*, 2011 S.D. 15, ¶ 23, 796 N.W.2d 706, 714).

[¶58.]	Manning's second and third claims of ineffective assistance of counsel require no further development of the record as we have addressed them, herein, as part of his claims on direct appeal, concluding they lack merit. Therefore, Manning did not receive ineffective assistance of counsel based on counsel's failure to object to witness bolstering or counsel's failure to move to dismiss a multiplicitous indictment.

[¶59.]	However, the alleged error regarding the jury selection process that Manning has raised is not the type of "exceptional circumstance" that would

warrant review of this claim on direct appeal. Because further development of the record regarding this issue would enhance our ability to review this claim, we decline to address it herein.

### 7. *Whether Manning was deprived of a fair trial by the cumulative effect of the alleged errors.*

[¶60.] Finally, Manning argues that when taken together, all of the errors committed at his trial amounted to an unfair trial. "[T]o determine whether a defendant was denied the constitutional right to a fair trial based on the cumulative effect of trial errors, we review the entire record to determine if a fair trial was held." *State v. Delehoy*, 2019 S.D. 30, ¶ 20, 929 N.W.2d 103, 108.

[¶61.] Having found no prejudicial error in any of the other issues analyzed, we fail to find cumulative error as well. To do so "would recognize a degree of error that is greater than the sum of its parts." *Reay v. Young*, 2019 S.D. 63, ¶ 26 n.7, 936 N.W.2d 117, 124 n.7.

[¶62.] Affirmed.

[¶63.] JENSEN, Chief Justice, SALTER and DEVANEY, Justices, and RASMUSSEN, Circuit Court Judge, concur.

[¶64.] RASMUSSEN, Circuit Court Judge, sitting for MYREN, Justice, who deemed himself disqualified and did not participate.