#30237-a-PJD
**2024 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

DANNY LAMAAR WASHINGTON,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE PATRICIA C. RIEPEL
Retired Judge

\* \* \* \*

LYNDSAY E. DEMATTEO
Sioux Falls, South Dakota                    Attorney for defendant
                                             and appellant.


MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                        and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
FEBRUARY 13, 2024
OPINION FILED **10/23/24**

#30237

DEVANEY, Justice

[¶1.] A jury found Danny Washington guilty on all counts alleged in an eight-count indictment, including first-degree kidnapping, injury to personal property, and multiple counts of aggravated and simple assault. He appeals, asserting his trial counsel was ineffective, there was insufficient evidence to support the kidnapping conviction, and he was improperly convicted on two counts of aggravated assault. He also argues that the circuit court's written sentence does not conform to its oral sentence. We affirm.

**Factual and Procedural Background**

[¶2.] J.B. and Washington were in a romantic relationship in October 2021. At the time, Washington was living in his father's home with his daughter, father, and stepmother. J.B. was living in a different home with her six children and their father, Bernard Vincent. Vincent and J.B. were no longer in a romantic relationship, but they continued to live together for the children. Much of the remaining evidence and testimony is disputed and is thus stated "in a light most favorable to the jury's verdict." *State v. Seidel*, 2020 S.D. 73, ¶ 2, 953 N.W.2d 301, 305.

[¶3.] On October 25, 2021, J.B. drove to Washington's house after he sent her a text message asking to meet and talk. While parked in his driveway, they sat inside her vehicle and had a conversation. Washington was upset and started yelling at J.B., asking her why she does not "take him seriously" and if she thinks "everything is a game." He also accused her of cheating on him. J.B. testified that

-1-

he then began choking her and slamming her head and face into the driver's side window.

[¶4.]    At some point, Washington's father called him to come inside the house. According to J.B., Washington forced her to get out of the vehicle, and when she did, he "came around to [her] side and he grabbed a handful of [her] hair in the back of her head and forcibly took [her] up the driveway and up the stairs to the front door." Washington's stepmother opened the front door and told them to argue somewhere else. Washington told J.B. "to stay put," but after he went inside, J.B. ran back to her car and drove away.

[¶5.]    J.B. testified that after she left, she did not call the police to report what had happened because she "was more scared than anything[.]" She drove directly to where she works as a caregiver at a residential facility for a company that provides daily care to residents. Her usual shift is from 9:00 p.m. to 7:00 a.m.

[¶6.]    After finishing her shift on the morning of October 26, J.B. exchanged multiple text messages with Washington regarding Washington's desire to meet with her. These were admitted as evidence during the trial. In one message, J.B. told Washington that she did not want anything to do with him, and in a reply, he stated, "I am going to make you hate me." She asked why and then told him to "[j]ust peacefully move on." She testified that she sent this text to try to end her relationship with him. She later sent a text indicating she was going to work, and thereafter, Washington sent her multiple messages that made her "feel uncomfortable[,]" including: "I will make you lose your job tonight I swear to god";

"Answer"; "Okay here I come"; "Answer me"; "You think I'm fucking playing[.]"  She testified that she did not reply to these messages.

[¶7.]        Later that day, when J.B. was at work, she heard Washington's voice through a monitor the facility uses for the residents.  She could see him in the hallway through a peephole in the door, and she heard him try to open the door to the room in which she was located.  The door was locked, and Washington started knocking and asking J.B. to let him inside.  She did not open the door and told him that she had already asked him to leave her alone.  J.B. used her phone to record Washington's actions through the door's peephole, and the recording was entered into evidence at trial.

[¶8.]        It is undisputed that Washington eventually left the building and walked into the parking lot.  While there, he threw rocks at the back and driver's side windows of J.B.'s vehicle, shattering the windows.  J.B. was unaware of the damage to her vehicle until around midnight when she entered the parking lot.  She did not see Washington cause this damage, although she suspected he did.  J.B. called law enforcement to report the vandalism, and at approximately 1:00 a.m. on October 27, 2021, an officer from the Sioux Falls Police Department responded.  J.B. told the officer she did not know who damaged her vehicle, but while testifying at trial, she explained that she said this because she "was scared" and she did not "want to tell on him."

[¶9.]        J.B. went back inside and resumed working.  When she completed her shift at approximately 7:00 a.m., it was raining, so she began placing towels in her broken car windows.  Because she could not drive her vehicle, she sent Vincent a

text asking to borrow his vehicle. While she was waiting in the parking lot for Vincent, Washington appeared in front of her vehicle out of nowhere. He told her to get into his vehicle. She claimed that she tried to "talk him down, keep the conversation calm[,]" but "eventually, [she] agreed to get into his car." She then sent Vincent a text stating, "Send help to my job[.]" She also called her coworker to say she had keys the coworker would need for the shift and asked the coworker to meet her at her car. At trial, J.B. explained that she did not really have keys her coworker would need, but made the call thinking she could ask the coworker for help. However, when the coworker arrived, Washington was standing in the vicinity of J.B.'s vehicle and J.B. did not feel it was safe to ask for help, so she gave the coworker her bag and told her to take it to the office.

[¶10.] After the exchange with the coworker, J.B. followed Washington back to his vehicle and sat in his passenger seat because he told her to. As Washington drove out of the parking lot, J.B. noticed that he had a black gun on his lap. He began yelling at her about the same things he expressed during their argument on October 25. She testified that she was afraid.

[¶11.] Vincent testified that he sent J.B. repeated texts after her request for help, but she did not respond. He went to her place of work, and after seeing her broken vehicle windows, he called 911. Eventually, Vincent was able to make phone contact with J.B. He testified that he could hear "in her voice that she was in danger; meaning, she was weeping, like crying." Officer John McMahon was beside Vincent during the call and testified that "she sounded like she was scared" and "as though she was crying." Officer McMahon's body camera footage was played for the

jury. It captured a female voice on the other end of Vincent's call crying and stating that she does not know where she is and that she could not talk.

[¶12.] Although J.B. testified that she did not recall speaking to Vincent on the phone, she recalled speaking to her mother briefly as she and Washington were leaving the parking lot. She claimed she told her mother about the broken windows and that she had reported it to law enforcement. She did not say anything more to her mother because Washington was rushing her to get off the phone. After she hung up, he told her to turn off her phone, which she did.

[¶13.] J.B. testified that at multiple points while Washington was driving, she considered jumping out of the vehicle but did not because she was worried no one would be able to help her or that Washington would shoot her. At one point, Washington stopped the vehicle on the side of the road in a residential area. He told her he was going to kill her and then himself and that she should call her children to tell them goodbye and that she loves them. She called her oldest son, but he did not answer. She called two of her younger children, and after they answered, she told them to have a good day at school and that she loved them.

[¶14.] After J.B. made these phone calls, Washington drove them to his home. J.B. testified that Washington took backroads to get there rather than the main streets. She also testified that while they were driving, he repeated that he was going to shoot her and then himself and explained that he planned to do so after he parked the vehicle in the garage. When they arrived at his home, Washington drove the vehicle into the garage and closed the garage door. J.B. testified that he then "clicked the gun," and "at that point, [she was] just crying,

begging him" to let her call her son. In response to her plea, he told her that she now knows "what it feels like to beg because he had to beg for [her] to open the door" at her work the night before.

[¶15.] Washington did not let J.B. call her son. Instead, he pointed the gun to her head. She testified that she was crying and covering her face and that he told her to "put [her] hands down because he wanted to see [her] when he shoots [her]." She also testified that he was yelling at her because she was crying. She eventually looked at him and saw that he was getting out of the car. She saw him go to the front of the car and then reenter the vehicle without the gun. After this, he opened the garage door and started backing the vehicle out.

[¶16.] As Washington was backing out of the garage, law enforcement officers, who had arrived because of what they had learned since Vincent's 911 call, directed him to stop his vehicle. Officer John Wollman testified that he and Officer Gleg Slaven first told J.B. to exit the vehicle and stand by the patrol vehicles. Officer Wollman noticed she was nervous and had been crying. Officer Slaven testified that he then pulled Washington out of the driver's seat and placed him in handcuffs. Officer Wollman questioned Washington about "what was going on." Washington told him that he had picked up J.B. from work and that they were having an argument about their relationship. He claimed that she was crying and upset because of this and because he thought she was cheating on him.

[¶17.] Meanwhile, Officer Slaven spoke with J.B. in his patrol vehicle. He testified that "she was crying pretty hysterically" and would not give him much information. He explained that "[i]t got to the point where all she would say is that

she got in the car willingly" and that "she was not assaulted[.]" To Officer Slaven, her behavior was not unusual in his experience when responding to domestic violence calls. He testified that because her emotions did not fit with what she was saying to him, he did not believe she was telling the truth.

[¶18.] At some point, Sergeant Aaron Nyberg arrived at the scene and joined Officer Slaven in speaking with J.B. J.B. eventually provided details that prompted the officers to arrest Washington for "[s]imple assault domestic intimidation." After the officers left the scene with Washington, J.B. began sharing more details about what had occurred, including that Washington had a gun. She told Sergeant Nyberg where the gun could be located in the garage. After obtaining permission from Washington's stepmother to search the garage, law enforcement found the gun in a bag containing softballs in front of where the car would have been parked in the garage. The gun had a bullet in the chamber.

[¶19.] On November 9, 2021, a grand jury indicted Washington on the following charges: (1) first-degree kidnapping; (2) aggravated assault (deadly weapon); (3) aggravated assault (physical menace); (4) possession of a firearm by a felon; (5) injury to personal property; (6) aggravated assault (impede breathing or circulation); (7) simple assault (attempt/has ability); and (8) simple assault (physical menace). Counts 1 through 5 were alleged to have taken place on or about October 27, 2021, and counts 6 through 8 on or about October 25, 2021. The State also filed a part II information alleging Washington to be a habitual offender.

[¶20.] Washington pled not guilty. Prior to trial, he filed multiple pretrial motions, including motions in limine to direct the State and its witnesses to refrain

from referring to J.B. as a "victim" and from referencing his status on parole.[1] Washington also filed a motion for the circuit court to allow him to have a personal copy of the discovery while he was incarcerated. The State objected, and the court denied the motion after noting that Washington had access to all discovery through his attorney and that there were risks associated with having unsecured police reports and other discovery documents in the jail. The court granted Washington's motions to preclude references to his parole status and use of the word "victim."

[¶21.] A jury trial began on March 28, 2022, during which J.B., Vincent, Officers Wollman and Slaven, and Sergeant Nyberg provided testimony for the State consistent with the above-described events. J.B. additionally testified about a letter she had written to the circuit court on November 1, 2021, stating that Washington did not physically harm her and requesting that all charges against him be dropped. At trial, she testified that Washington pressured her to write this letter.

[¶22.] During the testimony from the law enforcement officers, the State offered the officers' body camera footage from October 27, 2021, into evidence. Washington did not object, and the footage was played for the jury. After the jury watched the footage from Officer Wollman's body camera, Washington moved for a mistrial because during the video Officer Wollman can be heard saying he had not called Washington's parole officer yet. Defense counsel noted that he had "done his best to make sure" he caught all references to Washington's parole status when he

---

1. Washington committed the current offenses against J.B. after being released on parole in September 2021 for a conviction of aggravated assault against a previous girlfriend, C.B.

reviewed the videos for redaction, but "missed one." Nevertheless, he requested a mistrial because the reference to Washington's parole status violated the court's ruling on his motion in limine. The State agreed that the statement was missed by both parties but argued the error was harmless. The court took the motion under advisement.

[¶23.] Thereafter, the State called additional law enforcement officers, including Detective Logan Eilers, who testified that between October 28 and November 1, 2021, Washington, while incarcerated, attempted to contact J.B. 126 times by telephone, 25 times successfully. He also testified that Washington sent J.B. many emails. According to Detective Eilers, the topic of conversation in the phone calls concerned him because Washington repeatedly asked J.B. to recant the statements she had made to the officers on October 27 and to not show up for the grand jury proceeding.

[¶24.] Detective Eilers further testified about a letter J.B. had received prior to the date of the grand jury proceeding. J.B. gave the letter to law enforcement and reported that a man, acting on behalf of Washington, gave her the letter at a gas station. The letter was entered into evidence at trial. In it, Washington directed J.B. to call the State and say that she is not pressing charges. He then wrote what she was to say "word for word," including that he did not do the things she said he did, that she was requesting contact with him, that her "emotions got the best of [her,] and [that she was] sorry for wasting the court's time."

[¶25.] After Detective Eilers's testimony, the State rested, and Washington moved for a judgment of acquittal on "all counts, specifically as to Count II,

aggravated assault," which alleged aggravated assault by knowingly causing or attempting to cause bodily injury with a deadly weapon. The circuit court denied Washington's motion. He then renewed his motion for a mistrial. In regard to whether Washington was prejudiced by the jury hearing the reference to his parole officer, defense counsel informed the court that Washington had told him "a couple of jurors had reacted when they heard the word 'parole officer' on the video[.]" In response, the State argued that the motion should be denied because Washington failed to show actual prejudice from the mention of "parole officer." The circuit court denied the motion.

[¶26.] In his defense, Washington took the stand and acknowledged that he and J.B. had gotten into an argument on October 25. However, he claimed it was only a verbal argument. Washington also did not dispute that he was at J.B.'s place of work on October 26 at approximately 11:00 p.m. and broke her vehicle windows. However, in regard to what occurred after J.B.'s shift ended that next morning, Washington testified that he did not force or threaten her to get into his vehicle. To support this, defense counsel played the surveillance video from the parking lot while Washington explained to the jury what was occurring on the video. During his explanation, Washington repeatedly stated that there was no hostility exhibited between them.

[¶27.] When asked about the drive to his home, Washington disputed that he took backroads, that he stopped the vehicle for an extended time, or that he had a firearm on his person or in the vehicle. He agreed that J.B. was crying while he was driving, but he claimed it was "like a small cry" and not hysterical.

[¶28.]     During cross-examination, Washington admitted to sending J.B. text messages but claimed that the exhibit showing the messages did not include messages she had deleted. He further testified that he could not produce the deleted texts because J.B. "took [his] phone from [his] father" after he was incarcerated. Washington did not dispute that he wrote the letter asking J.B. to forego testifying at the grand jury but claimed he made the request "[b]ecause this is all a lie. This is all a charade. This is all a theatrical." In response to the State's questions during cross-examination, Washington agreed that he had been convicted of a crime of dishonesty in 2010 as well as felonies in 2012 and 2017. Defense counsel did not ask any questions on re-direct, and after Washington's testimony, the defense rested.

[¶29.]     The jury returned a guilty verdict on all counts. After trial, Washington sent a pro se letter to the circuit court requesting new counsel. Defense counsel thereafter filed a motion to withdraw. At a hearing in April 2022, the court heard comments from Washington and defense counsel. Washington claimed that counsel first communicated with him on December 3, 2021, met with him for only twenty minutes on December 23, and did not stay long enough to give him a chance to fully review the discovery. He further stated that he sent counsel 99 emails and counsel sent only 23 to him. He claimed that counsel did not come to see him again until March 22, the week before the trial, and only talked to him for 30 to 45 minutes. He thus argued that his attorney could not say "he really fought for [him] or that he put his best foot forward for [him.]"

[¶30.]     Defense counsel agreed there had been a breakdown because of a loss of trust. However, he disagreed with the suggestion that he only worked on Washington's case one week before trial. He noted that he was able to work on the case without meeting with Washington because Washington had given him a sense of direction for his defense after reviewing the discovery. Counsel did not dispute the disproportionate number of emails sent by Washington compared to his responses but claimed "that the numbers only tell part of the story." Counsel expressed concern with having Washington proceed to sentencing with new counsel who is unfamiliar with the trial; however, he believed the benefits of appointing new counsel outweighed the drawbacks. The circuit court granted the motion and allowed trial counsel to withdraw.

[¶31.]     On September 13, 2022, the circuit court held a change of plea hearing during which Washington's new counsel advised the court that a plea agreement had been reached regarding the part II information filed in this current file, #21-7754, and on the charges in four additional criminal files in Minnehaha County: #21-7855 (witness tampering and seven counts of violating a protection order as to J.B. from October 20 to November 1, 2021); #21-8213 (witness tampering and eight counts of violating a condition of bond (no contact order as to J.B.) from November 1 to November 9, 2021); #22-1558 (one count of violating a protection order or no contact order as to J.B. on March 3, 2022); and #22-5819 (ten felony counts of violation of a protection order or no contact orders as to his prior victim, C.B., on August 27 and 28, 2022). Washington agreed to plead guilty to count 1 in criminal file #21-7855 (witness tampering) and admit to the part II information in the

current file, #21-7754. In exchange, the State would dismiss the remaining charges and part II information in criminal file #21-7885 and all charges in criminal files #21-8213, #22-1558, and #22-5819. The circuit court accepted Washington's guilty plea and admission and ordered the completion of a presentence investigation report.

[¶32.] On November 17, 2022, the same day set for sentencing, Washington filed a motion for a new trial, arguing that he was denied a fair trial. The motion alleged the following grounds: the State and its witnesses used the word "victim" at trial; Officer Wollman referenced Washington's parole status in the video; trial counsel failed to tell Washington's father that he could not be in the courtroom during the testimony of other witnesses, thereby rendering his father incapable of testifying; the circuit court conducted voir dire in chambers for certain jurors without his presence; and trial counsel was ineffective. Washington attached to his motion an affidavit from his father alleging that he had asked trial counsel to be a witness and that his testimony was important because it related to the credibility of J.B.'s trial testimony. His father further alleged that trial counsel "never told [him] that [he] needed to remain outside the courtroom or be sequestered."

[¶33.] The circuit court proceeded with the sentencing hearing on November 17 and advised the parties it would consider the motion for a new trial at a subsequent hearing. After considering arguments from counsel and an allocution from Washington, the court orally sentenced Washington, in file #21-7754, to 100 years on count 1 (kidnapping); 15 years on count 2 (aggravated assault with a deadly weapon); five years on count 4 (possession of a firearm by a felon); five years

on count 5 (injury to personal property); and one year in county jail for simple assault. The court ordered these sentences to run concurrently with each other. The court also imposed 15 years on count 6 (aggravated assault by impeding breathing or circulation), to run consecutively to the sentences for the other counts. The court did not impose sentences on the other counts in file #21-7754. All of the sentences in #21-7754 were ordered to run consecutively to the sentences imposed in two other criminal files (#17-999 and #16-8651) in which Washington had been previously convicted of aggravated assault and witness tampering regarding C.B. These were the two convictions for which Washington was on parole at the time he committed the offenses against J.B.

[¶34.] Additionally, in file #21-7855 (witness tampering regarding J.B.), the court imposed a fully suspended ten-year sentence, consecutive to the sentences in file #21-7754 and to the sentences imposed in files #17-999 and #16-8651.

[¶35.] The circuit court held a hearing on Washington's motion for a new trial on December 1, 2022. After considering arguments from counsel, the court noted that the crux of Washington's motion was the alleged poor quality of his trial counsel's representation. To the court, however, nothing in the record showed, as asserted by new counsel, that Washington was constructively denied the assistance of counsel. The court also determined that Washington was not denied a fair trial. The court denied the motion.

[¶36.] During this same hearing, the circuit court indicated its intent to modify the sentence it had orally imposed on November 17, and it heard arguments from both parties and statements from J.B. and Washington's prior victim, C.B.

Thereafter, the court orally modified its sentence for the kidnapping conviction. On January 4, 2023, the court issued both a written "Judgment & Sentence" and a written "Sentence Modification Order." The judgment and sentence sets forth the court's sentences as orally stated at the November 17 hearing. The sentence modification order states that "[t]he [c]ourt modified [Washington's] sentence *as to* [the kidnapping count] *FROM* – one hundred (100) years . . . *TO* – one hundred (100) years . . . with . . . sixty (60) years suspended." The order further provided that "[a]ll other terms and conditions imposed on November 17, 2022 shall remain in full force and effect."

[¶37.]     Washington appeals, asserting the following restated issues:

1.     Whether trial counsel was ineffective.

2.     Whether the circuit court erred in denying Washington's motion for a judgment of acquittal on the kidnapping charge.

3.     Whether Washington was denied a fair trial due to the cumulative effect of alleged errors.

4.     Whether the circuit court's written sentence conforms to its oral sentence.

5.     Whether Washington was improperly convicted on multiple counts of aggravated assault.

**Analysis and Decision**

***1.     Whether trial counsel was ineffective.***

[¶38.]     In support of his argument that trial counsel's performance was ineffective, Washington sets forth multiple inactions by trial counsel, including the failure to:

-15-

- "adequately consult or communicate with Washington prior to the jury trial";
- "investigate defenses";
- sequester Washington's father "resulting in that witness not being able to testify on Washington's behalf";
- object to the admission of text messages from J.B.'s phone;
- subpoena J.B.'s phone records;
- redact the "parole officer" statement from Officer Wollman's body camera footage;
- object when the State used the word "victim" in voir dire and closing argument;
- advocate for Washington's "request for a personal copy of his discovery";
- object when the State "allowed [Washington's] character and lifestyle to be dragged through the mud" on cross-examination; and
- re-direct Washington to point out errors in the State's case.

According to Washington, trial counsel's deficient performance in these respects fell below an objective standard of reasonableness. He also argues that counsel's deficient performance prejudiced him because, in his view, but for the errors, there is a reasonable probability that the result of the trial would have been different.[2]

[¶39.]    It is well settled that "[a]bsent exceptional circumstances, we will not address an ineffective assistance claim on direct appeal." *State v. Dillon*, 2001 S.D. 97, ¶ 28, 632 N.W.2d 37, 48. "The rule is a practical one, necessitated by the fact

---

2.    Washington alternatively argues that he need not show prejudice because "trial counsel's dereliction of duty was so great as to result in a structural error in that [Washington] was constructively denied counsel." But Washington was not denied counsel; rather, he challenges the adequacy of trial counsel's representation. As the United States Supreme Court has explained, it is only "the *complete* deprivation of counsel," *Neder v. United States*, 527 U.S. 1, 9, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999) (emphasis added), or "a *total* deprivation of the right to counsel," *Johnson v. United States*, 520 U.S. 461, 469, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997) (emphasis added), that constitutes structural error.

that 'the record on direct appeal typically does not afford a basis to review the performance of trial counsel.'" *State v. Alvarez*, 2022 S.D. 66, ¶ 34, 982 N.W.2d 12, 20 (quoting *State v. Vortherms*, 2020 S.D. 67, ¶ 30, 952 N.W.2d 113, 120). Therefore, "[t]he preferred arena for an ineffective assistance of counsel claim is a habeas corpus proceeding[,]" where "attorneys charged with ineffectiveness can explain or defend their actions and strategies, and thus a more complete picture of what occurred is available for review." *Dillon*, 2001 S.D. 97, ¶ 28, 632 N.W.2d at 48. It is "only when trial counsel was so ineffective and counsel's representation so casual as to represent a manifest usurpation of the defendant's constitutional rights" that this Court will depart from our general rule declining to address ineffective assistance of counsel claims on direct appeal. *State v. Arabie*, 2003 S.D. 57, ¶ 20, 663 N.W.2d 250, 256 (cleaned up).

[¶40.]     Here, Washington's challenge to trial counsel's performance illustrates the reason for this Court's preference that ineffective assistance of counsel claims be addressed in a habeas corpus proceeding where a record can be developed to allow this Court to adequately review counsel's performance. For example, while Washington contends he asked trial counsel to subpoena J.B.'s phone records and counsel failed to do so, there is nothing in the current record establishing either contention. Similarly, on this record, the Court cannot examine whether Washington's father was an intended witness or whether the only reason counsel did not call him was because the sequestration order was violated. Likewise, any inferences that could be drawn from trial counsel's billing records without testimony from counsel explaining how his time spent on these tasks prepared him for trial,

are limited. Given this undeveloped record, and because a review of trial counsel's performance as a whole does not reveal exceptional circumstances or a manifest usurpation of Washington's rights, we decline to address Washington's ineffective assistance of counsel claim on direct appeal.

> **2.      *Whether the circuit court erred in denying Washington's motion for a judgment of acquittal on the kidnapping charge.***

[¶41.]      Washington argues that the circuit court erred in denying his motion for a judgment of acquittal when "[t]he facts presented at trial show without a reasonable doubt that [J.B.] willingly entered Washington's car and, thereafter, made no move to leave the car, call for help, or request to be let out of the vehicle or garage[.]" He is essentially asking this Court to reweigh the evidence and view it in a light most *unfavorable* to the prosecution. But when reviewing de novo the denial of a motion for judgment of acquittal, "we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Peneaux*, 2023 S.D. 15, ¶ 24, 988 N.W.2d 263, 269 (citation omitted). Further, "the jury is the exclusive judge of the credibility of the witnesses and the weight of the evidence[,]" and "this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence." *Id.* (first alteration in original) (citation omitted).

[¶42.]      Applying these rules of review here, we conclude that the evidence supports the jury's guilty verdict on the kidnapping charge. J.B. testified that she was afraid of him, she entered his vehicle because he told her to, and she stayed in

the vehicle because she was afraid of what he would do to her if she tried to leave. Also, in finding that the elements of kidnapping had been met, the jury could have considered the physical abuse Washington inflicted on her on October 25, his threats thereafter, and his acts of coming to her place of work demanding she let him inside and breaking her vehicle windows when she refused. The jury could have further relied on J.B.'s testimony that she sent Vincent a text asking him to send help and that Washington thwarted her plan to ask for help from her coworker.

[¶43.]        However, Washington also argues that he could not be convicted of kidnapping because even if J.B. felt confined by the presence of the firearm, "the evidence presented for kidnapping and presented for aggravated assault were identical[,]" and thus, the confinement was incidental to the act of aggravated assault.[3] On the contrary, in *State v. St. Cloud*, the Court determined that "kidnapping cannot be considered incidental to another crime" where "the

---

3.      Washington's argument, though not stated in such terms, implicates what this Court has called the "*Curtis/Reiman* test." *See State v. Reiman,* 284 N.W.2d 860 (S.D. 1979) and *State v. Curtis,* 298 N.W.2d 807 (S.D. 1980). Under that test, "kidnapping cannot occur if the acts of confinement in the kidnapping are only incidental to another crime." *State v. Traversie*, 2016 S.D. 19, ¶ 10, 877 N.W.2d 327, 331. This test has not been cited by the Court since *Traversie,* and we note that it may be in tension with our well-settled law that a defendant can be convicted of more than one crime when the Legislature intends to impose multiple punishments for the same act. *See State v. Chavez*, 2002 S.D. 84, ¶ 15, 649 N.W.2d 586, 593. In any event, it is apparent that this Court has either stepped back from or narrowly applied the *Curtis/Reiman* test. *See, e.g., State v. Lykken,* 484 N.W.2d 869, 876 (S.D. 1992) (noting that "the *Curtis/Reiman* doctrine is not meant to allow a rapist a free kidnapping because he also commits a rape"); *State v. St. Cloud*, 465 N.W.2d 177, 181 (S.D. 1991) (declining to apply the doctrine, noting that "most movement of rape victims by their attackers is designed to seclude the victim from possible assistance and to prevent escape").

kidnapping consists of prolonged confinement or movement from one premises to another[.]" 465 N.W.2d 177, 181 (S.D. 1991). Here, the record establishes that Washington's confinement of J.B. was prolonged and that he moved her a substantial distance from her place of work to his home. *See State v. Traversie*, 2016 S.D. 19, ¶ 11, 877 N.W.2d 327, 331 (rejecting the defendant's argument that the kidnapping was merely incidental to the assault when the confinement "greatly exceeded the period necessary to" commit the assaults). The record also establishes that Washington's confinement of J.B., including when he took less-populated backroads to his home and closed the garage door to hide J.B. from view, increased the risk of harm otherwise present. *See State v. Reiman*, 284 N.W.2d 860, 874 (S.D. 1979) (addressing whether alleged kidnapping was incidental to a rape by considering whether the movement of the victim increased the risk of harm otherwise present).

[¶44.] Additionally, the offense of kidnapping is not limited to an allegation of *confinement* and the jury was also instructed, in accord with SDCL 22-19-1, that first-degree kidnapping occurs when one unlawfully *removes* another a substantial distance from the vicinity where the other was at the commencement of the removal. In that regard, the evidence presented at trial supports that Washington unlawfully removed J.B. a substantial distance from her place of work when he drove her from the parking lot, through backroads, to his home. The circuit court

properly denied Washington's motion for judgment of acquittal on the kidnapping

charge.[4]

### 3. Whether Washington was denied a fair trial due to the cumulative effect of alleged errors.

[¶45.]	Washington argues that the cumulative effect of errors occurring at trial denied him his constitutional right to a fair trial. His first alleged error reverts to his claim that his trial counsel's performance was deficient, and for the reasons stated above, we cannot address his ineffective assistance of counsel claim on direct appeal. His other alleged errors include: (1) the State and its witnesses collectively referring to J.B. as a "victim" six times; (2) the jury hearing the "parole officer" statement from Officer Wollman's body camera footage; (3) the circuit court interrupting his testimony when he was answering the State's questions; and (4) the court conducting voir dire for some prospective jurors in chambers without him being present.

[¶46.]	Though we have not found the existence of cumulative error, we have recognized that a series of unrelated errors could conceivably aggregate to a critical tipping point of prejudice. *State v. Wilson*, 2020 S.D. 41, ¶ 34 n.16, 947 N.W.2d 131, 140 n.16. In this case, we are not convinced that the alleged errors Washington identifies resulted in incremental, much less aggregated, error.

---

4.	In his reply brief on appeal, Washington raises for the first time an argument that the circuit court erred in denying his motion for judgment of acquittal on count 2 (aggravated assault with a deadly weapon). Although this was the count he specifically challenged below, it is well settled that a party may not raise an issue for the first time in the reply brief when the opposing party on appeal can no longer address it. Therefore, the issue is not properly before this Court. *In re S.A.*, 2023 S.D. 47, ¶ 17 n.4, 996 N.W.2d 66, 71 n.4; *State v. Roedder*, 2019 S.D. 9, ¶ 24, 923 N.W.2d 537, 545.

[¶47.] Here, while Washington is correct that error occurred when the State and its witnesses violated the court's in limine orders by using the word "victim" and by the jury hearing Officer Wollman refer to Washington's parole status, Washington's analysis of this issue fails to address how he was prejudiced by these, or any of the other alleged errors, under our governing case law. Moreover, Washington did not object below to at least some of the uses of the term "victim," to the court's alleged interruptions, or to the alleged questioning of jurors in chambers in his absence.[5] Thus, these unpreserved alleged trial errors could only be considered under the more stringent plain error review. *See State v. Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d 196, 200 (providing that this Court reviews unpreserved claims under plain error review).

[¶48.] As to the alleged errors, it is apparent from the context in which the term "victim" was used at trial and the very damaging evidence against Washington as a whole, that he has not shown a reasonable probability that but for this error, the jury would have likely reached a different verdict. *See id.* ¶ 21, 968 N.W.2d at 202–03 (providing that to prevail on the third prong of plain error review, there must be a "'reasonable probability' that, but for the error, the result of the proceeding would have been different"). He also has not shown prejudice by the jury hearing Officer Wollman refer to his parole officer on the body camera footage,

---

5. It appears from the trial transcript that Washington's counsel may have eventually objected to the use of the term "victim" during the State's examination of Detective Eilers because counsel asked to approach the bench and there were no further uses of the term during Detective Eilers's testimony. However, there was no follow-up record made regarding the discussion at the bench.

given his own testimony that he had prior felony convictions.[6]  And in regard to the circuit court interrupting his testimony, Washington has not established error because the alleged interruptions generally occurred when Washington strayed from the question answered or when he provided a narrative.  In such instances, the court's interruptions were within its authority under SDCL 19-19-611 to "exercise reasonable control over the mode and order of examining witnesses . . . to . . . [a]void wasting time[.]"  *See Blue v. Blue*, 2018 S.D. 58, ¶ 22, 916 N.W.2d 131, 138 (concluding that the "court's restriction in limiting narrative answers was a perfectly reasonable control over the method of examining witnesses and presenting evidence").  To the extent the jury may have looked unfavorably on his testimony, this was a result of Washington's own actions.  Finally, although Washington contends he was not present during the portion of voir dire that occurred in chambers, the record is inadequate for this Court to review that claim.[7]

[¶49.]        Based on our review, we conclude Washington has failed to establish he was denied a fair trial.

---

6.    Also, the body camera reference to Washington's parole status does not, itself, reflect judicial error.  The circuit court granted Washington's motion to exclude any evidence of parole.  The reference to parole was the result of both parties' inadvertent failure to excise it from the footage.

7.    Notably, when newly appointed defense counsel raised this issue during the hearing on the motion for a new trial, the circuit court indicated it could not recall whether Washington was present; however, the court stated that it is the court's "practice to [have] the lawyer, the defendant, the prosecutor, the court reporter, [and] the clerk" present.

### 4. *Whether the circuit court's written sentence conforms to its oral sentence.*

[¶50.]     The parties dispute whether the terms of the circuit court's written order modifying Washington's sentence control over a seemingly inconsistent statement the court made during its oral pronouncement at the sentence modification hearing. "It is well settled that the written sentence must conform to the court's oral pronouncement." *State v. Thayer*, 2006 S.D. 40, ¶ 8, 713 N.W.2d 608, 612. "When there is a difference between the written and oral sentences, we review the sentence 'under the premise that the oral sentence controls.'" *State v. Cook*, 2015 S.D. 46, ¶ 6, 865 N.W.2d 878, 880 (quoting *Thayer*, 2006 S.D. 40, ¶ 7, 713 N.W.2d at 611). However, "if the oral sentence is ambiguous, the written judgment may be relied upon to clarify the ambiguity." *State v. Munk*, 453 N.W.2d 124, 125 (S.D. 1990).

[¶51.]     To determine whether the written sentence conforms to the oral sentence and whether there is ambiguity in the court's oral sentence, it is important to note that Washington's sentence in the file at issue (#21-7754) references three other criminal files—file #21-7855 in which he pled guilty to witness tampering related to J.B., and files #16-8651 and #17-0999 in which he had been previously sentenced for crimes associated with a different victim, C.B.

[¶52.]     In regard to the circuit court's oral sentence in criminal file #21-7754, the court imposed a 100-year sentence on the first-degree kidnapping conviction with credit for 386 days served and no time suspended. Also within criminal file #21-7754, the court imposed concurrent sentences on other counts and a 15-year consecutive sentence on the October 25 aggravated assault conviction. In the

separate witness tampering file related to J.B., #21-7855, the court imposed a fully suspended ten-year sentence and ran it consecutive to the sentences in file #21-7754. The court ordered all sentences imposed in files #21-7754 and #21-7855 pertaining to crimes against J.B. to run consecutively to the sentences in files #16-8651 and #17-999 pertaining to crimes against C.B.[8] The court later entered a written judgment and sentence containing these sentencing terms.

[¶53.] However, at the sentence modification hearing, the circuit court orally stated as follows:

> With regards to file number, um, 21-7754 the court imposed 100 years in that case. The court will suspend 60. *40 years concurrent with the [C.B.] case*, however, the other count in that case that will, that the court previously sentenced him on that will be concurrent.
>
> The third - - the second case dealing with tampering that sentence remains and that will be consecutive.

(Emphasis added.) Relying on this emphasized language, Washington argues that the court orally modified the kidnapping sentence in two ways: (1) by suspending 60 years and (2) by ordering it to run concurrently with the sentence in #16-8651 (one of the criminal files concerning C.B.). He then notes that the written sentence modification order does not contain a provision reflecting the second sentence modification. Therefore, Washington argues that remand is necessary for the court to enter a written sentence conforming to its oral pronouncement.

---

8.     In criminal file #16-8651, a different circuit court judge imposed a 15-year sentence with five years suspended, and in file #17-999, that same judge imposed a ten-year sentence, fully suspended, and ordered that it be consecutive to the sentence in #16-8651.

[¶54.] The circuit court's reference to "40 years concurrent with the [C.B.] case," when read in isolation, suggests the court modified Washington's kidnapping sentence to run concurrently with his sentence in a case involving C.B. However, it is not clear that the court intended such a modification, when the phrase is considered in light of the court's subsequent statements at the modification hearing and its prior oral sentence on November 17. *See State v. Cady*, 422 N.W.2d 828, 832 (S.D. 1988) (determining whether the oral sentence was ambiguous by examining the circuit court's statements at both the original and subsequent sentencing hearings); *State v. Sieler*, 1996 S.D. 114, ¶ 12, 554 N.W.2d 477, 481.

[¶55.] For example, after stating that the kidnapping sentence will be "concurrent to the [C.B.] case," the court used the word "however," cueing that a different directive would be stated next. Yet, the court again used the word "concurrent" in its statement following "however," when stating how the kidnapping sentence will run in relation to other counts in "that case." When these initial statements by the court are compared to its original sentence ordering the kidnapping conviction to run concurrently with other sentences in the kidnapping file but consecutively to both files involving C.B., a reasonable inference is that the court misspoke and was, instead, attempting to restate the remainder of its original sentencing terms.

[¶56.] As further indications that the circuit court may have misspoken, we note the court's statements thereafter which, instead of clarifying the court's intent, contain what appear to be additional misstatements or inaccuracies. First, the court referred to "the other *count* in that case being concurrent"; yet there were

actually multiple other *counts* in the kidnapping case on which concurrent sentences were imposed and one single *count* with a consecutive sentence.[9] (Emphasis added.) Then, later in the modification hearing, the court referred to the ten-year consecutive sentence on the witness tampering charge and appears to have added that to the 40 years of time imposed on the kidnapping conviction (as modified) when referring to the 50 years on which Washington's parole would be calculated. In response, the State asked for a clarification on whether the court was also modifying the ten-year sentence that it had previously fully suspended. The State also reminded the court that there were sentences on counts within the "original case" (referring to the kidnapping case) that were consecutive.

[¶57.] When posed with these questions, the circuit court asked for a bench conference, presumably in an effort to clear up the confusion. But after going back on the record, the court (inconsistently) referred to only 40 years being suspended on the kidnapping count, rather than 60 as previously stated.[10] The court then referred to a "second set of cases with the agg assault and simple assault" when

---

9. Washington's claim that the circuit court modified the kidnapping sentence to run concurrent to only one of the two files relating to C.B. (#16-8651) suggests he may be interpreting the court's statement regarding "the other count in that case" to be a reference to the other case file relating to C.B. (#17-999) being concurrent. However, given that the court also used the phrase "that case" in the proceeding sentence when referring to the kidnapping case regarding J.B., it is plausible that the court's subsequent reference to "that case" was in regard to another count in the kidnapping file. The lack of clarity as it pertains to the second reference to "that case" further illustrates how the court's oral sentence is ambiguous.

10. Notably, when arguing that the oral modification controls over the written modification order, Washington is not asking this Court to apply the court's oral statement made after the bench conference in which the court suspended only 40 years, rather than 60, of the 100-year kidnapping sentence.

those were, in fact, from the same case file containing the kidnapping conviction. As the State aptly notes on appeal, a review of this transcript as a whole reveals the court was "confus[ed] regarding the interaction of the various criminal files and the modification being made." *See State v. Holsing*, 2007 S.D. 72, ¶ 12, 736 N.W.2d 883, 885 (noting that "[a]n oral sentence is ambiguous if 'the extent of the sentence cannot be ascertained from the language used'" (citation omitted)).

[¶58.] While the circuit court attempted to clarify, at the conclusion of the sentence modification hearing, that the only sentence being modified was "the kidnapping case[,]" the court's pronouncement in totality, including the court's initial statement, was ambiguous. Therefore, this Court can use the circuit court's written sentence to clarify the ambiguity. *See Cady*, 422 N.W.2d at 832 (concluding that the written sentence clarifies the ambiguous oral pronouncement). In unambiguous terms, the written modification order provides that the court modified only the 100-year kidnapping sentence by suspending 60 of those years. Contrary to Washington's claim, the court did not modify the kidnapping sentence to run concurrently with the sentence in file #16-8651. As such, it is unnecessary to remand for the court to issue an amended written sentence.

### 5. *Whether Washington was improperly convicted on multiple counts of aggravated assault.*

[¶59.] Washington argues that the circuit court improperly entered convictions on both count 2 (aggravated assault with a deadly weapon) and count 3 (aggravated assault by physical menace) when these two counts arose out of the same factual incidents. He acknowledges that the court only imposed one sentence,

on count 2, but he maintains that imposing convictions on both aggravated assault counts violated his constitutional right to be free from double jeopardy.[11]

[¶60.]     As it pertains to Washington's conduct on October 27, 2021, he was indicted on two counts of aggravated assault in violation of SDCL 22-18-1.1: one under subsection (2) alleging he attempted to cause, or knowingly caused, bodily injury to J.B. with a dangerous weapon; and the second under subsection (5) alleging he attempted by physical menace with a deadly weapon to put J.B. in fear of imminent serious bodily harm. The jury found Washington guilty on both counts. At the November 17 sentencing hearing, the court asked the parties whether there was any objection to *sentencing* Washington on count 2 (aggravated assault with a deadly weapon). Neither party objected, and the court imposed a 15-year sentence, stating that it is "obviously one act[.]"[12] In its written judgment and sentence, the court identified all of the counts on which the jury found Washington guilty, including counts 2 and 3. However, under the portion of the judgment relating the sentence, the court stated that as to count 3, it "did not imposed [sic] or suspended [sic] any incarceration time."

---

11.  Washington's reply brief alleges the circuit court imposed sentences on both counts 2 and 3, albeit concurrently. While there is language near the end of the written judgment and sentence stating that "the sentences in Counts 1, 2, 3, 4, 5, 7 and 8 shall run concurrently to each other," it appears the court mistakenly included count 3 in this sentence provision because in an earlier paragraph relating specifically to count 3, the court did not impose or suspend any incarceration on this count.

12.  On appeal, the State asserts that Washington's convictions on counts 2 and 3 were based on separate acts; however, the State did not object below to the circuit court's statement to the contrary.

[¶61.] The Double Jeopardy Clause protects "criminal defendants from both multiple prosecutions and multiple punishments for the same criminal offense if the Legislature did not intend to authorize multiple punishments in the same prosecution." *State v. Manning*, 2023 S.D. 7, ¶ 34, 985 N.W.2d 743, 754 (citing *State v. Bausch*, 2017 S.D. 1, ¶ 26, 889 N.W.2d 404, 412). There is no question here that the State could prosecute Washington on multiple counts of aggravated assault even though both counts arose out of the same factual incidents. As this Court stated in *State v. Baker*, "It is permissible under [SDCL 23A-6-23] to charge in separate counts the commission of the same offense in different ways in order to meet the evidence which may be adduced[.]" 440 N.W.2d 284, 293 (S.D. 1989); *see also Manning*, 2023 S.D. 7, ¶ 36, 985 N.W.2d at 755 (providing that the charges at issue were not required to be charged in the alternative and noting that "[t]he State is not required to pick between two viable theories that are supported by the evidence").

[¶62.] However, because SDCL 22-18-1.1 "describes one violation that may be established in four different ways[,]" when the charges arise out of the same alleged conduct and result in multiple guilty verdicts, "only one offense" is committed and to *punish* a defendant twice violates double jeopardy. *Baker*, 440 N.W.2d at 293; *see also State v. Chavez*, 2002 S.D. 84, ¶ 16, 649 N.W.2d 586, 593 (noting that it is not "permissible to punish a defendant more than once for one offense in violation of a single statute"). Thus, we must decide in this appeal whether the imposition of multiple convictions, but only one sentence, violates the prohibition against

multiple *punishments* contrary to the Double Jeopardy Clause. In regard to that question, this Court's past cases do not provide a clear answer.

[¶63.]    On the one hand, it appears the Court has upheld the imposition of multiple convictions so long as there is only one sentence. *See Baker*, 440 N.W.2d at 293 (reversing multiple sentences but deeming it unnecessary to vacate the multiple convictions of aggravated assault); *State v. Morato*, 2000 S.D. 149, ¶ 27, 619 N.W.2d 655, 663 (referring only to multiple sentences when directing a remand); *see also State v. Wright*, 2009 S.D. 51, ¶¶ 67–68 n.14, 768 N.W.2d 512, 533–34 n.14 (declining to address whether convictions for kidnapping and felony murder violated the Double Jeopardy Clause, but noting that defendant did not receive multiple punishments because the court did not impose a sentence on the felony murder conviction). On the other hand, in *State v. Well*, we held that multiple convictions could not stand despite the fact that the circuit court imposed only one sentence.[13] 2000 S.D. 156, ¶ 23, 620 N.W.2d 192, 197. In particular, we stated that "[i]t is established law that a defendant cannot receive two *convictions* for one crime unless the legislature intended multiple punishments." *Id.* (emphasis added). We therefore vacated the conviction on which the court imposed no sentence. *Id.* ¶ 25.

[¶64.]    In other cases decided after *Well*, the Court reiterated the premise that the remedy on appeal, when a defendant is punished twice for the same act, is to vacate the *conviction*. *See State v. Perovich*, 2001 S.D. 96, ¶ 35, 632 N.W.2d 12, 19;

---

13.    The Court in *Well* based its decision, in part, on the incorrect view that multiple counts based on the same offense may not be submitted to the jury without an instruction indicating the counts were in the alternative.

*Dillon*, 2001 S.D. 97, ¶ 22, 632 N.W.2d at 46; *Chavez*, 2002 S.D. 84, ¶ 17, 649 N.W.2d at 593 (noting that "two *convictions* for the same crime cannot stand without specific legislation to that effect" (emphasis added)). However, in these three cases, unlike here, the defendant also received multiple sentences. Nevertheless, in a recent case where the defendant alleged a double jeopardy violation after a jury found him guilty on both rape and sexual contact charges, we determined that no violation occurred. *Manning*, 2023 S.D. 7, ¶ 36, 985 N.W.2d at 755. We reached this conclusion not only because no sentences were imposed on the sexual contact charges, but also because the circuit court did not enter multiple judgments of *conviction* on those charges. *Id.*

[¶65.]     Because this Court's past cases have not consistently resolved the question whether it is a violation of double jeopardy to impose multiple convictions, it is instructive to consider the United States Supreme Court's reasoning when addressing similar double jeopardy claims. In *Rutledge v. United States*, the Court granted certiorari to resolve the conflict between circuits on the question whether it is proper to allow a judgment of conviction to be entered on two counts arising out of the same factual incident when only one sentence is imposed. 517 U.S. 292, 296, 116 S. Ct. 1241, 1245, 134 L. Ed. 2d 419 (1996). The Court began by noting that as to the offense at issue, the district court was required to impose a $50 special assessment for every conviction; thus, multiple punishments resulted, even though one sentence was entered. *Id.* at 301, 116 S. Ct. at 1247. However, the Court then stated that even if the assessment is ignored, the second conviction cannot stand in

light of the Court's decision in *Ball v. United States*, 470 U.S. 856, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985). *Rutledge*, 517 U.S. at 302, 116 S. Ct. at 1248.

[¶66.]        In particular, the Court explained:

> The separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction. Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.

*Id.* (internal citations omitted) (quoting *Ball*, 470 U.S. at 865, 105 S. Ct. at 1673). The Court in *Ball* further explained that although the government may seek a multi-count indictment and multiple counts can be submitted to the jury, if the jury returns a guilty verdict on each count, "the district judge should enter judgment on only one of the statutory offenses." 470 U.S. at 865, 105 S. Ct. at 1673. To conclude otherwise, the Supreme Court stated, "cannot be squared with Congress' intention" not to subject a defendant to two convictions for a single criminal act. *Id.* at 864, 105 S. Ct. at 1673.

[¶67.]        Under SDCL 22-7-9, multiple convictions arising from the same transaction would not impact a habitual offender's status if prosecuted under South Dakota law, nor would they affect parole status under SDCL 24-15A-18, both of which treat such convictions as one. Whether or not multiple convictions could impact a defendant who is later prosecuted as a recidivist offender in other jurisdictions is another matter, one we need not resolve here. In any event, the Supreme Court's reasoning in *Ball* and *Rutledge*, although not directly on point,

aligns more closely with what this Court has said in *Well*, *Chavez*, *Dillon*, and *Perovich*—multiple *convictions* for the same crime cannot be entered unless the Legislature has intended multiple punishments.[14] As such, we now clarify that a court violates double jeopardy when it imposes multiple convictions for a single statutory offense arising out of the same act.

[¶68.] Here, Washington did not allege a double jeopardy violation after the circuit court entered its judgment and sentence, and therefore, the State contends that whether the court improperly entered convictions on both counts 2 and 3 can only be reviewed for plain error. "To demonstrate plain error, [the appellant] must establish that there was: '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *Guziak*, 2021 S.D. 68, ¶ 10, 968 N.W.2d at 200 (citations omitted).

[¶69.] From our review of the circuit court's written judgment and sentence, it is not clear whether the court committed the error Washington alleges on appeal—that the court entered a *conviction* on count 3. Under SDCL 23A-27-4, the judgment of conviction must contain, among other things, "the plea, the verdict or findings, and the adjudication and sentence." The judgment does not contain any

---

14. This is not to say that collateral consequences relevant to the question whether there has been a *double jeopardy* violation are relevant when examining the propriety of a defendant's *sentence*. For example, parole eligibility is not part of a defendant's sentence. *State v. Semrad*, 2011 S.D. 7, ¶ 7, 794 N.W.2d 760, 763.

language expressly *adjudicating* Washington guilty of count 3.[15] *See, e.g.*, SDCL Title 23A Appendix of Forms, Form 19 (including a paragraph after the identification of the jury's verdict, stating, "It is, therefore, ORDERED that a Judgment of (guilty) . . . is entered as to the following: . . ."). Arguably, by not expressly entering a judgment of conviction by adjudicating him guilty on count 3, the circuit court did not violate Washington's right to be free from double jeopardy. In such a case, no *error* occurred, and our review would end.

[¶70.] However, even if we assume that the circuit court did enter a conviction on count 3 and thus violated double jeopardy principles, the court's error cannot be regarded as *plain*. Plain error requires a "clear or obvious" error. *State v. McMillen*, 2019 S.D. 40, ¶ 23, 931 N.W.2d 725, 732. "In considering whether an error is 'clear or obvious' . . . we must decide whether controlling . . . precedent has reached the issue in question, or whether the legal question would be subject to 'reasonable dispute.'" *State v. Stevens*, 2024 S.D. 3, ¶ 23, 2 N.W.3d 372, 379 (quoting *McMillen*, 2019 S.D. 40, ¶ 23, 931 N.W.2d at 732); *see also State v. Bryant*, 2020 S.D. 49, ¶ 32, 948 N.W.2d 333, 341 (concluding that an error was not plain "[b]ecause our precedent results in a mixed message as to the correct interpretation of the statute"). Because this Court's past decisions on the question whether entering multiple convictions for a single statutory offense arising out of the same alleged act violates double jeopardy have not been clear, particularly when only one

---

15.     Although the same can be said for all of the counts on which the circuit court sentenced Washington, we can safely presume that, at least for the counts on which the court imposed a sentence, the court adjudicated Washington guilty of such counts.

sentence has been imposed, this legal question was subject to reasonable dispute. Therefore, the second prong of plain error review cannot be met.

[¶71.]		Going forward, in cases like this one, where a guilty verdict has been rendered on multiple counts for a single statutory offense resulting from the same act, a sentencing court should include express language stating that no judgment of conviction is being entered on a particular count.  Many judgments reviewed by this Court appropriately contain language of this sort.  Indeed, such clarity is helpful when later determinations are made on matters such as parole calculations or habitual offender status.

[¶72.]		Affirmed.

[¶73.]		JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.